**OFFICE COPY**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

KINGATE GLOBAL FUND LTD. and
KINGATE EURO FUND LTD.,

                          Plaintiffs,

             v.

DEUTSCHE BANK SECURITIES INC.,

                        Defendant.

-------------------------------------------------------------x

JUDGE BATTS

11 No. CIV 9364

**COMPLAINT FOR**
**DECLARATORY**
**RELIEF**

RECEIVED
DEC 21 2011
U.S.D.C. S.D.N.Y.
CASHIERS

       Plaintiffs Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund

Ltd. ("Kingate Euro" and, collectively with Kingate Global, the "Kingate Funds"), by

their attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, as and for their Complaint

herein, allege as follows:

**NATURE OF THE ACTION**

       1.      This is an action to enforce a major investment bank's "firm, irrevocable

and binding" commitment to purchase the bankruptcy claims of two investment funds

that lost the vast bulk of their assets as the result of Bernard Madoff's massive, and now

infamous, fraud.

       2.      For years leading up to the November 2008 collapse of Bernard L. Madoff

Investment Securities ("BLMIS"), the two Kingate Funds acted as so-called "feeder

funds," investing virtually all of their assets in BLMIS.  When Madoff's fraud was

publicly revealed, the Funds lost *billions* of dollars reflected on their monthly account

statements.

3.      As the result of their losses, the Kingate Funds are among the largest claimants against the Madoff estate, which is being administered under the Securities Investor Protection Act of 1970 ("SIPA") in a fashion similar to a bankruptcy case. Collectively, using the "net equity" method of calculation affirmed by the Second Circuit, the two Kingate Funds have net investment claims in the Madoff SIPA proceeding totaling nearly $750 million (an amount that will increase if the Kingate Funds pay further amounts to the Madoff estate, as explained below). This amount represents real and actual losses suffered by the Kingate Funds and their innocent investors – that is, it is the excess of the amount they invested over any amounts they withdrew before BLMIS' collapse.

4.      In early 2011, in order to make distributions to their investors expeditiously, the Kingate Funds determined that the best course of action was to sell their claims in the Madoff estate. After many months of marketing the claims, on August 24, 2011, defendant Deutsche Bank Securities Inc. ("Deutsche Bank"), a large investment bank and perhaps one of the most active bankruptcy claims purchasers in the world, agreed to purchase $1,624,748,095 in claims from the Kingate Funds. The agreement between the parties was memorialized in their "Confirmation Letter" – a document initially drafted by Deutsche Bank – that provides that the Kingate Funds will convey their Allowed Claims against the BLMIS estate, together with any interest they may have in a forfeiture fund maintained by the Department of Justice for victims of Madoff's fraud, to Deutsche Bank. In exchange, Deutsche Bank will pay the Kingate Funds 66.00% of that amount, or $1,072,333,743. The Confirmation Letter is attached as an exhibit to this Complaint.

2

5.       Notwithstanding the expressly binding commitment set forth in the Confirmation Letter, Deutsche Bank is unwilling to execute the ancillary document referenced in the Confirmation Letter – what the parties designated as the Purchase and Sale Agreement – in order to complete its purchase of the claims.  Deutsche Bank has conjured a rationale for its refusal to proceed; it maintains that a settlement agreement between the Kingate Funds and the Madoff estate's Trustee does not afford Deutsche Bank, as purchaser of the Kingate Funds' claims, with sufficient protection.  Deutsche Bank's excuse is a ruse on multiple levels.  As an initial and dispositive matter, absolutely nothing in the Confirmation Letter gives Deutsche Bank the right to demand *any* particular language in a settlement agreement to which it is not a party.  And, in any event, the Kingate Funds' settlement with the Madoff Trustee provides far greater protection to the purchaser of the Kingate Funds' claims than any claims purchaser ever could have reasonably anticipated.

6.       While Deutsche Bank contends that its unwillingness to consummate the sale it agreed to stems from a disagreement over contract language, Deutsche Bank's real reason for abandoning its commitment is plain to see.  Namely, in the months that have elapsed since Deutsche Bank signed the Confirmation Letter, the market price for claims in the Madoff estate has dropped by at least 6 cents on the dollar, if not more.  As a result, Deutsche Bank is violating one of the fundamental precepts of market trading; it is going back on its written, binding commitment to purchase the Kingate Funds' claims because it does not want to pay what it now views, with the benefit of hindsight, as too high a price.

3

7.      The Kingate Funds will suffer real and concrete damages if Deutsche Bank continues its bad faith attempt to either renegotiate or terminate what everyone understood to be – and what plainly states that it is – a done deal.  The Kingate Funds' settlement with the Madoff Trustee, which is the result of years of negotiations, will fall apart.  And the Kingate Funds and their innocent investors may recover nothing from the Madoff estate, notwithstanding their billions of dollars in losses.  All of this is avoidable if Deutsche Bank simply steps up and closes on the deal that it agreed to.

8.      Accordingly, in light of the actual controversy between the Kingate Funds and Deutsche Bank, the Kingate Funds seek declarations from this Court that will clarify (a) the binding nature of the Confirmation Letter and Deutsche Bank's commitment to purchase the Kingate Funds' claims thereunder, and (b) Deutsche Bank's obligation to sign the Purchase and Sale Agreement that has been proffered to it and to close on the transaction to which it already has agreed.

## PARTIES

9.      Plaintiff Kingate Global was an investment vehicle, incorporated in the British Virgin Islands on February 11, 1994, whose primary business activity entailed raising funds by share subscriptions for investment with BLMIS.

10.      Plaintiff Kingate Euro was an investment vehicle, incorporated in the British Virgin Islands on April 19, 2000, whose primary business activity entailed raising funds by share subscriptions for investment with BLMIS.

11.      Defendant Deutsche Bank is a Delaware corporation with its principal place of business in New York, New York.  Deutsche Bank is a wholly-owned subsidiary of Deutsche Bank AG and is registered as a broker-dealer with the Securities and Exchange Commission.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), as plaintiffs are companies incorporated in the British Virgin Islands; defendant is a Delaware corporation; and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

13.     Venue in this Court is proper under 28 U.S.C. § 1391 because Deutsche Bank is based in New York and negotiated the Confirmation Letter from New York. Additionally, the Confirmation Letter provides that all controversies in relation to the transaction at issue will be determined by courts located in New York, New York.

## GENERAL BACKGROUND

**The Kingate Funds**

14.     The Kingate Funds, each of which is based in the British Virgin Islands, were established for the purpose of investing with BLMIS funds obtained from investors. Up until November 2008, the Kingate Funds did just that. Indeed, over the course of many years, the Kingate Funds invested several billion dollars with BLMIS.

15.     As the world now knows, in November 2008, Bernard Madoff publicly confessed that BLMIS was a massive fraud. Contrary to his countless statements and explanations that BLMIS was employing a sophisticated split-strike conversion investment strategy, his true "investment" strategy was to keep all of his investors' money for his own purposes. It appears that Madoff never invested in any of the thousands of securities that he purported to purchase on behalf of his clients. Madoff's confession revealed the largest Ponzi scheme in history.

16.     Immediately following Madoff's confession, BLMIS was placed into a liquidation proceeding under the Securities Investor Protection Act. The SIPA

proceeding is being conducted much like a bankruptcy, and administrative matters that are essential to the proceeding are pending in the United States Bankruptcy Court for the Southern District of New York. At the time the SIPA proceeding was commenced, the Kingate Funds' account statements with BLMIS reflected balances of nearly $3.5 billion. According to Irving Picard, the Trustee appointed to oversee the SIPA proceeding, Kingate Global's net loss based upon the "net equity" method – that is, the total amount invested in BLMIS by Kingate Global less any amounts withdrawn over the years – is $540,158,888. The corresponding net loss based upon the same "net equity" method for Kingate Euro is $210,399,383, resulting in an aggregate net loss for the two Funds, based upon the "net equity" method, equal to $750,558,271.

17.     Upon the collapse of BLMIS and the commencement of the SIPA proceeding, the Kingate Funds lost almost the entirety of their assets. As a result, the two Kingate Funds are now in liquidation, subject to a formal Winding Up By Court process under the direction of the High Court of Justice of the British Virgin Islands (the "BVI Court"). William Tacon and Richard Fogerty have been appointed by the BVI Court to serve as Joint Liquidators of the two Kingate Funds.

## The Kingate Funds Endeavored to Sell Their Madoff Claims

18.     In the parlance of the BLMIS SIPA proceeding, the two Kingate Funds are what is commonly referred to as "net losers" – that is, they invested far more in BLMIS over the years than they took out. Net losers are the least fortunate of all Madoff investors. Not only were they misled as to the current value of their accounts, as reflected on their monthly account statements, but they were ultimately the ones whose funds were used by Madoff to perpetuate his Ponzi scheme and enjoy his extravagant

lifestyle. As noted just above, according to the SIPA Trustee, the Kingate Funds were net losers to the tune of *nearly three-quarters of a billion dollars*.

19.     Notwithstanding the Kingate Funds' losses, the SIPA Trustee has asserted claims *against* the Kingate Funds to recover amounts that the Funds withdrew during the years before the revelation of Madoff's fraud. The gravamen of the Trustee's action is that the Kingate Funds are not entitled to keep these transfers, either because they occurred shortly before the collapse of BLMIS (i.e., "preferential transfers") or, with respect to earlier withdrawals, because the Kingate Funds did not provide value in exchange for the withdrawals and the Kingate Funds should have realized that Madoff was conducting a fraud (i.e., "fraudulent transfers").

20.     Although the Kingate Funds believe they have valid defenses to the Trustee's claims, the Funds – which, as noted, are now in liquidation – lack the resources to make any substantial payments to the Madoff estate. Moreover, the Trustee has asserted that under applicable bankruptcy law, if the Kingate Funds do not pay the entire amount they allegedly owe to the estate, the Kingate Funds will be unable to recover a single penny on their claims against the estate because the claims will never be allowed by the Trustee or the bankruptcy court overseeing BLMIS' proceeding.

21.     Faced with this unique predicament, the Kingate Funds decided to sell their claims against the Madoff estate, and to use a portion of the funds to achieve allowance of the claims, and to distribute the balance of the funds to the Kingate Funds' investors. The Kingate Funds knew that there was an active market for the trading of BLMIS claims and determined that, by selling the claims, the Kingate Funds would (a) obtain sufficient funds to conclude a settlement with the Trustee of the BLMIS estate's

causes of action against the Kingate Funds, and (b) ensure that their affirmative "net equity" claims are allowed in the Madoff estate, benefiting both the Kingate Funds (which would obtain a fixed sum of cash) and the purchaser of the claims (which would enjoy the potential upside of distributions as and when made).

22.     In July 2011, the Kingate Funds and Deutsche Bank began discussions regarding the purchase of the claims.  On or about July 29, 2011, at the request of Deutsche Bank, the Kingate Funds agreed to cease any and all discussions with any other potential purchaser of their claims and to negotiate exclusively with Deutsche Bank for the next week.  Over the course of the following month, Deutsche Bank requested various extensions to this period of exclusive negotiations to which the Kingate Funds agreed.

23.     During the same month, while Deutsche Bank was deciding whether to execute the Confirmation Letter and thereby purchase the claims, the parties began exchanging drafts of a Purchase and Sale Agreement ("PSA") that the Confirmation Letter would inevitably reference.  The PSA, as is typically the case, would be a lengthier document reflecting the mechanics of the transaction, as well as restating the essential deal terms set forth in the Confirmation Letter.

**The Parties Execute the Confirmation Letter**

24.     Nearly a month after the Kingate Funds agreed not to market their claims to any other purchasers, on August 24, 2011, the parties executed a Confirmation Letter pursuant to which Deutsche Bank agreed to purchase the Kingate Funds' claims in the BLMIS SIPA proceeding.  Pursuant to the Confirmation Letter, Deutsche Bank agreed to purchase $938,862,953 in Allowed Claims from Kingate Global, and $685,885,142 from Kingate Euro.  In the Confirmation Letter, the Kingate Funds reiterated their commitment to "cease any and all discussions or negotiations with other potential purchasers."

25.     That same day, just before the parties' execution of the Confirmation

Letter, William Tacon, on behalf of the Kingate Funds, confirmed with Duane Masucci, a

Deutsche Bank managing director, that the parties would not run into any issues down the

road with the PSA.  After Masucci agreed that there would be no issues, Tacon sent him

the final Confirmation Letter with a note stating:

> Also, I appreciate that we have not yet finally agreed the
> [PSA] but can I remind you that in our discussions today,
> you confirmed that you were not aware of "show stoppers"
> and I have no reason to believe your position has changed,
> especially given that your group has had the last revision
> for more than 24 hours.

Masucci responded to Tacon's e-mail by sending back the Confirmation Letter counter-

signed by Deutsche Bank.

26.     The Confirmation Letter is a detailed agreement, providing all essential

terms of the parties' sale and purchase, and expressly states that it is a "firm, irrevocable

and binding agreement (the 'Transaction') to sell the Claims."

27.     In clear and unambiguous terms, the Confirmation Letter states exactly

what the Claims being sold are:

> The "Global Claim" is comprised of: (A) all right, title and
> interest, whether legal, equitable or otherwise, in the
> Allowed "claim" (as defined in 11 U.S.C. § 101(5)) of a
> "customer" for "net equity" (as such terms are defined in
> 15 U.S.C. §78lll) of Global against the Debtor in the Case;
> (B) all right, title and interest, whether legal, equitable or
> otherwise, in all rights to any recoveries of Global arising
> from or related to any forfeiture fund established pursuant
> to 28 C.F.R. Part 9 or otherwise (including, but not limited
> to, any such funds recovered pursuant to a settlement in
> (i) United States of America v. $7,206,157,717 On Deposit
> at JPMorgan Chase, N.A. in the Account Numbers Set
> Forth on Schedule A, No. 10-CV-9398 (S.D.N.Y.) (TPG))
> and (ii) United States of America v. $625,000,000 On
> Deposit at JPMorgan Chase, N.A. in the Account Numbers
> Set Forth on Schedule A, No. 10-CV-9116 (S.D.N.Y.)

9

(TPG)(RLE)) or any other restitution, remission or
mitigation processes or funds, or from any other fund
operated or administered by (or on behalf of) any entity,
governmental or otherwise, (including the US Department
of Justice) foreign or domestic (collectively, the "Forfeiture
Funds") and (C) subject to the third sentence in this
"Claims" section, any and all other claims, causes of
actions or other rights related to, or in connection with, the
foregoing subclauses (A) and (B).

The "Euro Claim" is comprised of: (A) all right, title and
interest, whether legal, equitable or otherwise in the
Allowed "claim" of a "customer" for "net equity" of Euro
against the Debtor in the Case; (B) all right, title and
interest, whether legal, equitable or otherwise, in all rights
to any of Euro arising from or related to the Forfeiture
Funds and (C) subject to the third sentence in this "Claims"
section, any and all other claims, causes of actions or other
rights related to, or in connection with, the foregoing
subclauses (A) and (B).

For the avoidance of doubt, the Claims shall not include
any of Seller's third-party litigation claims, which may be
transferred to the Trustee in Seller's sole discretion.

28.     The Confirmation Letter further defines the term "Allowed" with respect

to the Allowed Claims being transferred.

29.     A portion of the monies obtained in connection with the collapse of

BLMIS – particularly a $2.2 billion portion of the estate's settlement with the estate of

Jeffry Picower – is held and administered not by the BLMIS estate, but by the U.S.

Justice Department in what is sometimes referenced as a "Forfeiture Fund."  With respect

to the Kingate Funds' right, if any, to recover from any such Forfeiture Fund, the

Confirmation Letter provides that the Kingate Funds shall convey to Deutsche Bank "all

right, title and interest, whether legal, equitable or otherwise, in all rights to any

recoveries of Global arising from or related to any forfeiture fund."  Unlike the transfer of

their claims against the BLMIS estate – which must be "Allowed" as specifically defined

in the Confirmation Letter – the Kingate Funds transferred whatever rights they had to the Forfeiture Fund without any requirements that such rights be matured or enforceable. In other words, the Kingate Funds simply quitclaimed to Deutsche Bank their rights, if any, to recover from the Forfeiture Fund; a reasonable approach given that no one outside of the Justice Department knows when or how amounts in the Forfeiture Fund will be distributed.

30.   Notably, the Confirmation Letter expressly states that the "Global Claim Amount" is $938,862,953 and the "Euro Claim Amount" is $685,885,142.  Those amounts, as noted above, are the exact amounts of the Allowed Claims that Deutsche Bank was purchasing from the Kingate Funds.  Thus, Deutsche Bank agreed to pay the Kingate Funds 66% of the Allowed Claim amounts to secure whatever recovery would eventually flow from those Allowed Claims, whether as distributions from the BLMIS estate, as shares in a forfeiture fund maintained by the Department of Justice, or from any other source.  The Kingate Funds never guaranteed – nor could they possibly have guaranteed – that Deutsche Bank would actually recover from *any* source on the basis of those Allowed Claims.

31.   As is typical in such transactions, the Confirmation Letter states that the "Transaction is subject to execution of a Purchase and Sale Agreement (governed by New York law) in a form that is reasonably and mutually agreed between Seller and Buyer and which Seller and Buyer shall negotiate in good faith."  As set forth in paragraph 25, the parties had, in the view of the Kingate Funds, largely completed the drafting of that PSA before the execution of the Confirmation Letter.

**Negotiation of the Purchase Agreement and Settlement Agreement**

32.     The day after the parties executed the Confirmation Letter, Deutsche Bank's counsel sent a revised draft of the PSA to counsel for the Kingate Funds. Although Deutsche Bank already had represented that there would be no issues with the PSA, the new draft included extensive additions that had not appeared in prior versions of the document. Many of the proposed add-on's, however, had nothing to do with the deal terms set forth in the Confirmation Letter. Rather, they concerned new material terms and conditions that Deutsche Bank wished the Kingate Funds to obtain in the Funds' settlement with the BLMIS Trustee.

33.     Specifically, at the same time Deutsche Bank and the Kingate Funds were to be finalizing the PSA, the Kingate Funds were continuing to negotiate their Settlement Agreement with the BLMIS Trustee. The Settlement Agreement would resolve the BLMIS estate's causes of action against the Kingate Funds, establish the amount of the Kingate Funds' Allowed Claims against the BLMIS estate, and thus provide certainty as to the Allowed Claims that the Funds were required to deliver to Deutsche Bank. It was never contemplated, however, that Deutsche Bank (or any other third party) would be a party to the Kingate Funds' settlement with the BLMIS Trustee, and nothing in the Confirmation Letter provides Deutsche Bank with any right to request specific terms in the Settlement Agreement.

34.     Nonetheless, in the spirit of cooperation and to expedite completion of the claims sale, the Kingate Funds continued to discuss with Deutsche Bank its requests for language in the Settlement Agreement. Deutsche Bank was particularly focused on its right to recover from the Forfeiture Fund maintained and administered by the Department of Justice, in the government's discretion, and continually increased the scope of the

language that it requested – and ultimately demanded – that the Settlement Agreement

include with respect to the Forfeiture Fund.  In response to Deutsche Bank's increasingly

onerous demands for language that had no basis in the Confirmation Letter between

Deutsche Bank and the Kingate Funds, the Kingate Funds' counsel wrote to Deutsche

Bank's counsel on September 2, 2011:

> As a follow-up to our conversation yesterday regarding the
> remission fund [another name for the Forfeiture Fund], as
> we had indicated, Kingate intends to transfer to DB all of
> its rights, whatever they may be, to the remission fund and
> we are willing to try to get comfort language in the
> settlement agreement with the trustee, however, the
> language you requested requiring Kingate's claims to the
> remission fund to be allowed cannot be a condition to the
> trade. . . . [A]ny such requirement is not supported by the
> trade confirmation DB and Kingate entered into.

35.    Deutsche Bank, however, continued to press for increasingly more

burdensome language with respect to the Forfeiture Fund.  On September 9, 2011,

Deutsche Bank went so far as to demand language in the Settlement Agreement reflecting

the Department of Justice's advance agreement that the purchaser of the Kingate Funds'

claims would recover from the Forfeiture Fund.  Deutsche Bank made this demand

despite knowing that the Department of Justice was not a party to the Settlement

Agreement between the Kingate Funds and the BLMIS Trustee, and that a requirement

for such approval by the Department of Justice was farfetched.  Indeed, the Department

of Justice had made no announcements at all with respect to its intentions in

administering the Forfeiture Fund for the benefit of any victim of Madoff's fraud.

36.    Still attempting to assuage Deutsche Bank and to propose language for the

Settlement Agreement that, while not required of the Kingate Funds under the express

terms of the Confirmation Letter, would nonetheless satisfy Deutsche Bank's demands,

on or about September 16, 2011, with the Trustee's permission (and at Deutsche Bank's request), the Kingate Funds provided Deutsche Bank with a draft of the Settlement Agreement. Deutsche Bank thereafter provided the Kingate Funds with a series of comments on the Settlement Agreement, including, on September 22, 2011, a redline indicating a complete set of changes that Deutsche Bank wished to have made to the draft agreement between the Kingate Funds and the BLMIS Trustee. Although under no obligation to do so, one day later, the Kingate Funds shared Deutsche Bank's comments with the Trustee following Deutsche Bank's authorization to do so, and attempted to incorporate many of Deutsche Bank's comments into the Settlement Agreement.

37.     In response to the Kingate Funds' requests, the Trustee agreed to incorporate many of Deutsche Bank's comments in the Settlement Agreement. Most significantly, the Trustee agreed to include extensive language indicating that the Trustee's lawsuit against the Kingate Funds, and the settlement with the Kingate Funds, should not negatively impact any future recovery by the Kingate Funds (or any purchaser of the Kingate Funds' claims) from the Forfeiture Fund.

38.     Thus, even though (a) the Kingate Funds agreed to transfer to Deutsche Bank whatever their interests, *if any*, in the Forfeiture Fund would be, (b) Deutsche Bank never demanded, and the Confirmation Letter plainly does not require, that the Kingate Funds in fact have any entitlement to share in the Forfeiture Fund, and (c) the Kingate Funds never had any obligation to Deutsche Bank to include specific language in their Settlement Agreement with the BLMIS Trustee, the Kingate Funds obtained in the Settlement Agreement substantial "belt and suspenders" protections with respect to the

14

Forfeiture Fund that are above and beyond anything required by the Confirmation Letter with Deutsche Bank.

39.    On November 7, 2011, following weeks of additional negotiations with the Trustee, the Kingate Funds provided Deutsche Bank with a final Settlement Agreement and a corresponding PSA. While nowhere required in the Confirmation Letter, the Settlement Agreement includes substantial protections for the purchaser of the Kingate Funds' claims, including protections for recoveries from any forfeiture fund, including the Forfeiture Fund by name. The PSA was similarly revised to reflect the additional terms and protections in the Settlement Agreement that the Kingate Funds obtained.

**Deutsche Bank Refuses to Sign the PSA and Fulfill Its Obligations**

40.    Notwithstanding its obligations under the Confirmation Letter, for more than 30 days, Deutsche Bank has refused to sign the PSA. Rather, Deutsche Bank has repeatedly asserted that the protections in the Settlement Agreement are still inadequate and that it will not sign the PSA until the Settlement Agreement is further amended. Deutsche Bank has not responded to the final Settlement Agreement with specific comments or requested changes, but rather has broadly complained of insufficient revisions.

41.    For example, on November 16, 2011, Deutsche Bank's counsel sent a letter to the Kingate Funds' counsel requesting that the Kingate Funds "prevail upon Picard to accept the comments we have orally discussed, that we have set forth in the Mark Up as well as any comments that we may subsequently deliver to you." The November 16 letter did not identify any specific concerns or requested language, but

merely referred back to the mark up that Deutsche Bank had sent a month and half
earlier, on September 22, 2011.

42.     In response to Deutsche Bank's November 16 letter, on the following day,
counsel for the Kingate Funds sent a detailed, four-page letter that methodically reviewed
Deutsche Bank's requested language concerning the Forfeiture Fund and specific
language incorporated in the final Settlement Agreement addressing each concern raised
by Deutsche Bank.  The letter noted that "the Settlement Agreement between the Kingate
Funds and the Trustee, which we delivered to you on November 7, 2011, is fully
consistent with the terms of the August 24, 2011 Trade Confirmation signed by the
Kingate Funds and Deutsche Bank Securities Inc."

43.     Faced with a detailed recitation of the adequacy of the Settlement
Agreement, Deutsche Bank again remained silent for more than a week.  Finally, on
November 25, 2011, Deutsche Bank responded with yet another request that the Kingate
Funds "prevail upon the Trustee" to adopt all of the language requested by Deutsche
Bank for inclusion in the Settlement Agreement.  Deutsche Bank made no attempt
whatsoever to respond to the detailed review of Settlement Agreement provisions in the
Kingate Funds' November 17 letter, nor did Deutsche Bank specify what additional
protections it was seeking.  It had become clear by this point – if not much earlier – that
Deutsche Bank was engaged in a pattern of endless delay with no intention of
consummating the transaction to which it had agreed in the Confirmation Letter.

44.     Although the Kingate Funds had already presented Deutsche Bank's "wish
list" to the BLMIS Trustee (which they were under no obligation to do), and although
Deutsche Bank is not entitled by the Confirmation Letter to negotiate terms of the

Settlement Agreement, on December 1, 2011, counsel to the Kingate Funds yet again asked Deutsche Bank what additional terms it wished to have included in the Settlement Agreement. Once again, however, Deutsche Bank's counsel refused to identify the additional terms and conditions that Deutsche Bank was seeking, and simply referred back to whatever mark-ups had been sent several weeks earlier, prior to the final negotiated version. In the same discussion, counsel for the Kingate Funds suggested – having obtained the Trustee's approval – that principals and counsel for the Trustee, the Kingate Funds, and Deutsche Bank meet in person to address Deutsche Bank's purported concerns. Deutsche Bank declined to participate in such a meeting.

45.     Following the December 1 discussion, the Kingate Funds' counsel sent an e-mail to counsel for Deutsche Bank to confirm Deutsche Bank's position, so the Kingate Funds could accurately advise the BLMIS Trustee of the basis for Deutsche Bank's continued refusal to execute the PSA and complete the transaction set forth in the Confirmation Letter. Deutsche Bank's counsel never responded to that e-mail.

**Deutsche Bank's True Reason For Refusing to Close**

46.     Although Deutsche Bank asserts – without any support in the provisions of the Confirmation Letter – that it is entitled to additional protections in the Settlement Agreement for which it did not negotiate in the transaction memorialized in the Confirmation Letter, there is no mystery why, in fact, Deutsche Bank is refusing to close on its obligations under the Confirmation Letter. Specifically, the Confirmation Letter provides that Deutsche Bank will pay the Kingate Funds 66.00% of the designated Claim Amounts in exchange for those claims. On information and belief, similar claims are now selling at a price below 66.00%, perhaps as low as 60.00% (or lower).

47.     The difference between the agreed upon purchase price and the current market value is substantial.  On approximately $1.5 billion of Claims, a drop from 66% to 60% is equivalent to $90 million.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

48.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

49.     The Confirmation Letter between Deutsche Bank and the Kingate Funds expressly states that it is a "firm, irrevocable and binding agreement" to sell the Claims that are described in that agreement.

50.     The Confirmation Letter specifically provides the exact Claims that the Kingate Funds are conveying to Deutsche Bank.  As set forth in paragraph 27 above, the Confirmation Letter describes the Claims in detail.

51.     The Confirmation Letter specifically sets forth the amount of Claims that Deutsche Bank is purchasing from the Kingate Funds:  the Global Claim Amount is $938,862,953 and the Euro Claim Amount is $685,885,142.

52.     The Confirmation Letter specifically sets forth the price being paid by Deutsche Bank for the Claims:  66.00% of the Global Claim Amount and the Euro Claim Amount.

53.     The Confirmation Letter required the Kingate Funds to cease "any and all discussions or negotiations with other potential purchasers," a requirement with which the Kingate Funds already have complied.  Since August 2011, the Kingate Funds have not marketed their Claims to any other purchaser, notwithstanding Deutsche Bank's refusal to date to close on the transaction set forth in the Confirmation Letter.

54.     The Confirmation Letter provides that it shall be governed by New York law, and that all disputes relating to the Confirmation Letter and the transaction shall be determined by courts in the borough of Manhattan.

55.     The Confirmation Letter contemplates that the parties will execute a PSA also governed by New York law.  The Confirmation Letter does not state that its terms will not be binding in the absence of such a PSA.

56.     The Confirmation Letter is signed by both of the parties, including two managing directors on behalf of Deutsche Bank.

57.     Plaintiffs seek a declaration that the Confirmation Letter executed between Deutsche Bank and the Kingate Funds constitutes a binding agreement for the purchase and sale of the Claims specified in the Confirmation Letter.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment)

58.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

59.     In the definition of Claims being sold by the Kingate Funds, and being purchased by Deutsche Bank, the Confirmation Letter includes "all right, title and interest" of the Kingate Funds in the Forfeiture Funds.

60.     The Confirmation Letter does not state, nor could it possibly have stated, the exact nature of the Kingate Funds' interests in any Forfeiture Funds.  The method by which monies held in such funds will be distributed to BLMIS investors, if at all, has not been announced or, to the knowledge of the Kingate Funds, even determined.

61.     In contrast to the "net equity" claims against the BLMIS estate, which must be Allowed Claims as defined in the Confirmation Letter, the Confirmation Letter

does not include any requirements relating to any rights to share in the Forfeiture Funds, other than that they be conveyed from the Kingate Funds to Deutsche Bank.

62.    Deutsche Bank's repeated insistence that the Kingate Funds' Settlement Agreement with the BLMIS Trustee include provisions ensuring that the purchaser of the Kingate Funds' Claims will be permitted a recovery from the Forfeiture Funds, accordingly, has no basis in the Confirmation Letter and concerns an issue extraneous to the agreement between Deutsche Bank and the Kingate Funds set forth in the Confirmation Letter.

63.    Moreover, even though not required of the Kingate Funds, the Kingate Funds have obtained substantial language in the Settlement Agreement providing reasonable protection for the Kingate Funds, and any purchaser from the Kingate Funds, with respect to recovery from any Forfeiture Funds.  The Kingate Funds have provided detailed descriptions of this protective language, as well as a copy of the Settlement Agreement itself, to Deutsche Bank.  On repeated occasions, Deutsche Bank has refused to identify why those protections are inadequate or what further protections it wishes to have incorporated in the Settlement Agreement.

64.    To the extent that Deutsche Bank has identified other terms that it wishes to have included in the Settlement Agreement, the Kingate Funds have notified the BLMIS Trustee of those wishes and requested the inclusion of such language.  The final version of the Settlement Agreement, which the Kingate Funds provided to Deutsche Bank on November 7, 2011, includes reasonable terms that address all of the material comments made earlier by Deutsche Bank.

20

65.     In all events, the Settlement Agreement provides, with certainty, that the Kingate Funds will have Allowed Claims against the BLMIS estate, which are the only claims against the estate that the Kingate Funds are required to deliver to Deutsche Bank.

66.     By repeatedly asserting that the Settlement Agreement must include additional terms and conditions extraneous to the Confirmation Letter, by refusing to identify specifically which terms it seeks to have included in the Settlement Agreement, and by refusing to execute the PSA which is fully consistent with all of the terms and conditions of the Confirmation Letter, Deutsche Bank is acting in bad faith to create unnecessary delay and to avoid its obligations under the Confirmation Letter.

67.     As a result of Deutsche Bank's conduct, the Kingate Funds have been unable to conclude their settlement with the BLMIS Trustee – which is now in jeopardy of never being completed – and unable to obtain the Allowed Claims that are specified in that Settlement Agreement.

68.     Plaintiffs seek a declaration that Deutsche Bank's requirement that ancillary documents include material terms and conditions extraneous to the those set forth in the Confirmation Letter constitutes a violation of Deutsche Bank's obligation to negotiate such documents in good faith.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully pray that this Court:

A.     Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201 that:

    i.     The Confirmation Letter executed between Deutsche Bank and the Kingate Funds constitutes a binding agreement for the purchase and sale of the claims specified in the Confirmation Letter; and

       ii.     Deutsche Bank's requirement that ancillary documents include material terms and conditions extraneous to the those set forth in the Confirmation Letter constitutes a violation of Deutsche Bank's obligation to negotiate such documents in good faith.

      B.     Award reasonable attorneys' fees and costs; and

      C.     Award such other relief available under the law that may be considered appropriate under the circumstances, including other fees and costs of this action to the extent allowed by the law.

DATED:   New York, New York
           December 21, 2011

                          QUINN EMANUEL URQUHART &
                          SULLIVAN, LLP

                          By: _____
                            Richard I. Werder, Jr.

                          51 Madison Avenue, 22nd Floor, New York,
                          New York  10010-1601
                          (212) 849-7000

                          *Attorneys for Plaintiffs Kingate Global Fund*
                          *Ltd. and Kingate Euro Fund Ltd.*

# EXHIBIT

Please accept this letter (the "Confirmation Letter") as confirmation of our firm, irrevocable and binding agreement (the "Transaction") to sell the Claims (defined below) at the Purchase Rate (defined below) to Deutsche Bank Securities Inc. on the following terms:

| | |
|---|---|
| **Trade Date:** | August 24, 2011 |
| **Seller:** | Kingate Global Fund Ltd. ("Global") and Kingate Euro Fund Ltd. ("Euro"), by and through their Joint Liquidators |
| **Buyer:** | Deutsche Bank Securities Inc. |
| **Debtor:** | Bernard L. Madoff Investment Securities LLC and its estate |
| **Trustee:** | Irving H. Picard, as trustee for the liquidation of the Debtor |
| **Case:** | *In re Bernard L. Madoff Investment Securities LLC*, SIPA Liquidation Adv. Pro No. 08-01789 (BRL), as substantively consolidated with *In re Bernard L. Madoff*, pending in the United States Bankruptcy Court for the Southern District of New York |
| **Claims:** | The "Global Claim" is comprised of: (A) all right, title and interest, whether legal, equitable or otherwise, in the Allowed[1] "claim" (as defined in 11 U.S.C. § 101(5)) of a "customer" for "net equity" (as such terms are defined in 15 U.S.C. §78lll) of Global against the Debtor in the Case; (B) all right, title and interest, whether legal, equitable or otherwise, in all rights to any recoveries of Global arising from or related to any forfeiture fund established pursuant to 28 C.F.R. Part 9 or otherwise (including, but not limited to, any such funds recovered pursuant to a settlement in (i) *United States of America v. $7,206,157,717 On Deposit at JPMorgan Chase, N.A. in the Account Numbers Set Forth on Schedule A*, No. 10-CV-9398 (S.D.N.Y.) (TPG) and (ii) *United States of America v. $625,000,000 On Deposit at JPMorgan Chase, N.A. in the Account Numbers Set Forth on Schedule A*, No. 10-CV-9116 (S.D.N.Y.) (TPG)(RLE)) or any other restitution, remission or mitigation processes or funds, or from any other fund operated or administered by (or on behalf of) any entity, governmental or otherwise, (including the US Department of Justice) foreign or domestic (collectively, the "Forfeiture Funds") and (C) subject to the third sentence in this "Claims" section, any and all other claims, causes of actions or other rights related to, or in connection with, the foregoing subclauses (A) and (B).<br><br>The "Euro Claim" is comprised of: (A) all right, title and interest, whether legal, equitable or otherwise in the Allowed "claim" of a "customer" for "net equity" of Euro against the Debtor in the Case; (B) all right, title and interest, whether legal, equitable or otherwise, in all rights to any of Euro arising from or related to the Forfeiture Funds and (C) subject to the third sentence in this "Claims" section, any and all other claims, causes of actions or other rights related to, or in connection with, the foregoing subclauses (A) and (B). |

---

[1] "Allowed" shall mean allowed as a valid, enforceable, liquidated, non-contingent, undisputed, unavoidable, and unsubordinated claim that is not subject to any actual or potential avoidance, reduction, set-off, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise, and whether pursuant to Section 510(c) of the United States Bankruptcy Code or otherwise), counterclaim, cross-claim, defenses, disallowance (whether under sections 502(b), (d), or (e) of the United States Bankruptcy Code or otherwise), impairment, objection, or any other challenges under any applicable law, whether foreign or domestic.

03972.61603/4318604.2     1

For the avoidance of doubt, the Claims shall not include any of Seller's third-party litigation claims, which may be transferred to the Trustee in Seller's sole discretion.

**Global Claim Amount:** $938,862,953
**Euro Claim Amount:** $685,885,142

**Purchase Rate:** of the Global Claim Amount and the Euro Claim Amount.

**Other Terms of the Transaction:**

Seller agrees that Seller shall cease any and all discussions or negotiations with other potential purchasers and will not solicit any other bids and will not respond in any way to any solicitation with respect to the Claims.

Buyer shall be the sole purchaser of the Claims and Buyer shall be the sole party with whom Seller shall negotiate the settlement of the Transaction contemplated herein.

All distribution and payments made on account of the Claims whether paid before, on or after the Trade Date shall be for the account of Buyer.

Seller agrees that it shall keep this Confirmation Letter and the terms contained herein strictly confidential subject to any applicable legal or regulatory obligations. Notwithstanding the foregoing, Seller shall not discuss this Confirmation Letter and the terms contained herein with any potential purchasers. Seller shall not disclose any discussions with Buyer to any other party.

The Transaction is subject to execution of a Purchase and Sale Agreement (governed by New York law) in a form that is reasonably and mutually agreed between Seller and Buyer and which Seller and Buyer shall negotiate in good faith.

This Confirmation Letter shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions that would require the application of the laws of any other jurisdiction.  Any controversies arising between Seller and Buyer under this Confirmation Letter and in connection with, or in relation to, the transaction contemplated herein will be determined in the federal or state courts located in the State of New York and the borough of Manhattan.

Sincerely,

Kingate Global Fund Ltd.

By:
Name: William R Tacon
Title: Joint Liquidator

Kingate Euro Fund Ltd.

By:
Name: William R Tacon
Title: Joint Liquidator

Agreed and accepted by:

Deutsche Bank Securities Inc.

By:
Name:  Scott G Martin
Title:   Managing Director

By:
Name:  Duane Masucci
Title:  Managing Director

03972.61603/4318604.2                                        3