UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                            :
KINGATE GLOBAL FUND LTD. and                                :
KINGATE EURO FUND LTD.,                                      :
                                                            :
                      Plaintiffs-Counterclaim-Defendants,   :        No. 11 CIV. 9364 (DB)
                                                            :
                                                            :
                                                            :        ANSWER TO COMPLAINT
              v.                                            :        AND COUNTERCLAIM OF
                                                            :        DEUTSCHE BANK
                                                            :        SECURITIES INC.
DEUTSCHE BANK SECURITIES INC.,                              :
                                                            :
                      Defendant-Counterclaim Plaintiff.     :
                                                            :
-------------------------------------------------------------------x

Deutsche Bank Securities Inc. ("DBSI"), by and through its undersigned

attorneys, Milbank, Tweed, Hadley & McCloy LLP, for its Answer to the Complaint of Plaintiffs

Kingate Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Kingate Euro")

(collectively, the "Kingate Funds" or the "Funds") and its Counterclaim for declaratory relief

against the Kingate Funds, pursuant to 28 U.S.C. § 2201(a), states as follows:

## COUNTERCLAIM FOR DECLARATORY RELIEF

1.      In August 2011, after an earlier attempt to sell the claims had failed, each

of the Kingate Funds offered to sell to DBSI two claims relating to Bernard L. Madoff

Investment Securities LLC ("BLMIS").  Consistent with longstanding industry practice, the

proposed billion dollar transaction was made expressly subject to the parties' negotiation and

execution of a mutually agreeable Purchase and Sale Agreement ("PSA"), which would set forth

all of the terms and conditions governing the transaction.  From August to November 2011,

DBSI and its counsel engaged in extensive negotiations with the Kingate Funds in an effort to

agree on definitive documentation for the proposed transaction.  Despite DBSI's good faith

efforts, the parties have been unable to reach agreement on a number of critical terms.  At this

stage, DBSI has more than satisfied any obligation to negotiate the transaction.

## INTRODUCTION

2.      The Kingate Funds' claims arise out their investments in BLMIS prior to

the uncovering of the Madoff fraud.  Upon information and belief, as two of the largest feeder

funds for BLMIS, the Kingate Funds invested in excess of $1.6 billion of customer funds in

BLMIS to be managed by Bernard Madoff.  The claims the Kingate Funds have offered to sell to

DBSI are alleged to be in an aggregate principal amount of $1,624,748,095.

### The Kingate Funds Do Not Own The Claims In The Amount Or The Form That They Have Proposed Selling To DBSI

3.      At the outset, the Kingate Funds do not have claims in the form they have

proposed selling to DBSI.  The Kingate Funds, and their former principals, have been sued by

Irving Picard, the Trustee of the BLMIS estate (the "Madoff Trustee").  *See Irving Picard,*

*Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, v. Federico Ceretti*

*et al.*, Adv. Pro. No. 09-1161 (BRL) (Bankr. S.D.N.Y.).  The Madoff Trustee's complaint

includes allegations that the Kingate Funds' former principals received lucrative fees to the tune

of hundreds of millions of dollars while on actual notice of BLMIS's fraudulent activity.

Further, prior to the uncovering of the Madoff fraud, the Kingate Funds redeemed almost $1

billion of the more than $1.6 billion they had invested in BLMIS.  The Madoff Trustee has

alleged that these redemptions constituted unlawful preferential and fraudulent transfers.

4.      In his prayer for relief, the Madoff Trustee seeks, among other remedies,

the return of the nearly $1 billion the Kingate Funds redeemed from BLMIS.  The Madoff

Trustee also has requested that the Court *disallow* and *subordinate* any claims the Kingate Funds

may have against the BLMIS estate, including any claims to recover the approximately $750 million that the Funds had invested in BLMIS but had not redeemed at the time of the BLMIS bankruptcy.  Under certain circumstances, the Bankruptcy Code permits a trustee to disallow a creditor's claims in their entirety or, alternatively, to subordinate that creditor's claims to those of others, where the creditor has engaged in wrongdoing or inequitable conduct.  The Madoff Trustee's claims against the Kingate Funds presumably proceed on a theory that the Funds' behavior was so egregious that they should not participate equally with other putative victims of the Madoff fraud.

**Any Settlement Between The Kingate Funds And The Madoff Trustee**
**Is Mutually Dependent On The Sale Of The Kingate Funds' Claims**

5.   Any sale of the Kingate Funds' claims is predicated on the Funds' successful settlement of the lawsuit brought by the Madoff Trustee.  Put simply, the Kingate Funds would have no claims to sell to DBSI unless, among other things, the Kingate Funds achieve a settlement with the Madoff Trustee, persuade the Madoff Trustee to release the BLMIS estate's separate litigation claims against the Funds, and then obtain the approval of the settlement by the United States Bankruptcy Court.  In addition, because the Kingate Funds are presently the subjects of a liquidation proceeding in the British Virgin Islands ("BVI"), any settlement between the Kingate Funds and the BLMIS estate also would require the approval of the BVI Court overseeing the Funds' liquidation.  Therefore, the settlement with the Madoff Trustee is the event that will create the bundle of rights the Kingate Funds seek to sell.

6.   The Kingate Funds lack sufficient assets of their own to achieve a settlement with the Madoff Trustee.  The only means the Funds have of securing the vast sums of money necessary to fund such a settlement is to sell their potential claims relating to BLMIS to a third party.  This creates a chicken and an egg problem.  The Kingate Funds cannot sell their

claims free and clear to a third party without, among other things, settling the Madoff Trustee lawsuit. But the Funds cannot settle with the Madoff Trustee without first lining up a potential buyer whose purchase price will fund any such settlement with the trustee.

7.      Given the expected purchase price of approximately $1 billion, any entity interested in buying the Kingate Funds' claims would reasonably insist on appropriate legal protections in both the purchase and sale agreement for the claims and the settlement agreement between the Funds and the Madoff Trustee. These protections would provide, among other things, that the claims would be sold "free and clear" of any other party's liens, rights or causes of action; that the claims would fully share in any assets received on behalf of BLMIS customers and victims from all possible sources of recovery; that the Kingate Funds were not complicit in the Madoff fraud; that any purchaser of the claims would be a third-party beneficiary of the settlement agreement; and that any purchaser would have the right to review and consent to the settlement agreement. These are precisely the types of contractual provisions that DBSI, an experienced claims trader, sought during its negotiations with the Kingate Funds.

**The Kingate Funds Have Not Been Able To
Deliver What They Proposed Selling To DBSI**

8.      Each of the Kingate Funds has potential claims against two possible sources of funds: a "Customer Claim" that would seek a recovery from the estate in the BLMIS SIPA liquidation (the "BLMIS Case") pending before the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"); and a "Remission Claim" that would seek a recovery from a so-called "Forfeiture Fund" administered by the United States Department of Justice ("DOJ").

9.      The Remission Claim constitutes a significant percentage of the value of the claims that the Kingate Funds propose to sell. Upon information and belief, the Forfeiture

Fund currently holds more than $2 billion – approximately 20% of the total assets recovered for BLMIS creditors and victims. Further, depending on the outcome of certain court proceedings, it is not inconceivable that the Forfeiture Fund could hold well in excess of 20% of the total assets recovered. The DOJ has appointed Mr. Picard, the Madoff Trustee, to also serve as the Special Master to administer the Forfeiture Fund. As Special Master, Mr. Picard has been tasked by the DOJ with helping to identify eligible victims, verifying their losses, and distributing the forfeited funds in accordance with the DOJ's regulations.

10.     The right to obtain a pro rata recovery from the Forfeiture Fund, without risk of disallowance or subordination, represented a significant portion of the value ascribed to the billion dollar purchase price proposed by DBSI for this transaction. Throughout the parties' negotiations, DBSI took the position that the Remission Claim must fully share in any recovery from the Forfeiture Fund on a pro rata and unsubordinated basis. This condition was crucial given that the Madoff Trustee has sued the Kingate Funds, alleged that the Funds were on notice of the Madoff fraud and had engaged in inequitable conduct, and asserted several claims seeking equitable disallowance and subordination as well as avoidance of the Funds' redemptions and the return of those monies to the estate. The allegations made by the Madoff Trustee, and the scope of the relief sought against the Kingate Funds, could have the effect of vitiating the Remission Claim in its entirety.

11.     DBSI has been steadfast in advising the Kingate Funds that any definitive deal documentation needed to reflect, among other things, (i) that DBSI would have the right to review and consent to any settlement agreement between the Kingate Funds and the Madoff Trustee; (ii) that the settlement agreement would remove any risk that the claims sold by the Kingate Funds would not receive a recovery on the Remission Claim on a pro rata and

unsubordinated basis; and (iii) that DBSI would have the right to enforce the terms of any such settlement agreement as a third-party beneficiary.

12.     The very first draft purchase and sale agreement ("PSA") prepared by DBSI reflected each of these terms. On August 18, 2011 (six days before the parties executed the Confirmation Letter discussed below), DBSI sent to the Kingate Funds a 17-page, single-spaced draft PSA. This draft contained numerous proposed representations, warranties and covenants by the Kingate Funds relating to the proposed transaction, including several provisions relating to the Remission Claim.

13.     On August 24, 2011, after the parties had commenced their negotiations over the terms of a PSA, the Kingate Funds and DBSI executed a Confirmation Letter. By its express terms, the letter recognized that the proposed transaction was "subject to execution of a Purchase and Sale Agreement" that was to be "reasonably and mutually agreed between Seller and Buyer and which Seller and Buyer shall negotiate in good faith." The Confirmation Letter set forth a proposed purchase price of 66% of the Kingate Funds' potential claims in the amount of $1,624,748,095. Therefore, the purchase price totaled slightly more than $1 billion. The economics of the transaction would have been much different had the Kingate Funds offered to sell only a contingent interest in the Forfeiture Fund, which could be allowed or denied based on the unreviewable discretion of the DOJ or Mr. Picard, as Special Master. In light of the claims alleged by the Madoff Trustee against the Kingate Funds, an experienced claims buyer would never agree to pay the prevailing market price for an enforceable and collectible claim only to receive what amounted to a speculative claim whose rights of recovery were to be determined by a third party in its boundless discretion.

14.     After executing the Confirmation Letter, DBSI continued to engage in extensive negotiations with the Kingate Funds to reach agreement on all open issues relating to the proposed transaction.  DBSI's counsel drafted and circulated multiple versions of the PSA; drafted and circulated multiple versions of confidentiality agreements with the Kingate Funds and the Madoff Trustee; revised and commented upon several drafts of the settlement agreement between the Kingate Funds and the Madoff Trustee; and engaged in countless communications – orally and in writing – all in an effort to reach comprehensive deal terms.

15.     At all relevant times, DBSI acted with utmost good faith.  Despite DBSI's exhaustive efforts, the parties have not been successful in negotiating a PSA acceptable to both sides.  Among a variety of contractual issues that remain unresolved is the Kingate Funds' inability to provide assurance that, in exchange for the proposed billion dollar purchase price, DBSI would receive a full recovery on the Remission Claim the Kingate Funds purported to have the ability to sell.  Nor have the Kingate Funds been able to agree that DBSI will have an enforcement mechanism – whether as a third party beneficiary to the settlement agreement with the Madoff Trustee or otherwise – to ensure that DBSI has legal recourse to enforce the terms of any settlement agreement.

16.     The Kingate Funds have acknowledged that at present they cannot provide assurance that the Remission Claim will receive a full recovery from the Remission Fund.  The Kingate Funds, however, now assert that all DBSI proposed to buy was a Remission Claim that the DOJ or Special Master could deny or disallow at their own unreviewable discretion, without any legal redress.  The Kingate Funds' position runs counter to industry standards, the parties' course of dealings, each and every draft PSA circulated by DBSI, and the Confirmation Letter executed by the parties.  DBSI did not agree to take this enormous risk in exchange for the

billion dollar purchase price.  The proposed purchase price reflected market value of an enforceable and collectible claim, not one that was speculative.  In short, the Kingate Funds are asserting that DBSI should be required to execute a PSA not "reasonably and mutually agreed" between the parties.

17.    Accordingly, in light of the actual controversy between DBSI and the Kingate Funds, DBSI seeks a declaration (i) that the Confirmation Letter, standing alone, does not bind DBSI to purchase the claims; (ii) that to the extent the Confirmation Letter obligated DBSI to negotiate in good faith with the Kingate Funds, DBSI has fully complied with any such obligation; and (iii) that at this date, DBSI has no ongoing obligation under the Confirmation Letter to continue to negotiate the PSA with the Kingate Funds.

## PARTIES

18.    Defendant-Counterclaim Plaintiff Deutsche Bank Securities Inc. is a Delaware corporation with its principal place of business in New York, New York.

19.    Upon information and belief, Plaintiff-Counterclaim Defendant Kingate Global is an investment fund incorporated in the BVI.  Plaintiff-Counterclaim Defendant Kingate Euro is an investment fund incorporated in the BVI.  The Kingate Funds are the subject of a liquidation proceeding in the BVI.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction under 28 U.S.C. § 1332(a)(1).  DBSI is a Delaware corporation.  Kingate Global and Kingate Euro are companies incorporated in the BVI. The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

21.    Venue in this Court is proper under 28 U.S.C. § 1391.

## BACKGROUND

22.    Upon information and belief, at all relevant times Kingate Global and Kingate Euro acted as feeder funds for BLMIS.  Over the course of many years, the Kingate Funds invested approximately $1.6 billion of their customers' assets into BLMIS.  The Kingate Funds did not invest their clients' money in any investment vehicles other than BLMIS; from their creation in the 1990s through the time that the BLMIS fraud was publicly disclosed in 2008, the Kingate Funds invested 100% of their customers' assets exclusively in Bernard Madoff's Ponzi scheme.

### The Madoff Trustee's Claims Against The Kingate Funds

23.    The Madoff Trustee has commenced an adversary proceeding in the United States Bankruptcy Court against the Kingate Funds and their former principals for their alleged conduct in connection with the BLMIS fraud.  In a detailed 83-page complaint, the Madoff Trustee has alleged, among other things, that the Kingate Funds operated as BLMIS's *de facto* "sales force," reaping hundreds of millions of dollars in fees in exchange for funneling their clients' money into BLMIS.  According to the Madoff Trustee's complaint, the Kingate Funds' former principals, among other bad conduct, (i) repeatedly failed to conduct any due diligence on BLMIS; (ii) suppressed inquiries by others into the *bona fides* of BLMIS; and (iii) ignored numerous indicia of fraudulent activity at BLMIS.  Among such indicia of fraud was the Kingate Funds' receipt of periodic account statements from BLMIS that reflected impossible options trading volume and other information inconsistent with quoted market data.

24.    The Madoff Trustee seeks, among other relief, the recovery of the nearly $1 billion the Kingate Funds redeemed from their BLMIS accounts prior to the uncovering of the Madoff fraud.  The Madoff Trustee also seeks equitable relief with respect to claims the Kingate Funds may have arising from the BLMIS fraud, including claims for disallowance and

subordination and the return of any monies redeemed from BLMIS. Thus, the Madoff Trustee –

based on the Kingate Funds' allegedly improper conduct – seeks to disallow or subordinate

claims that the Kingate Funds are proposing to sell to DBSI.

25.     Unless the Kingate Funds can prevail in litigation or settle their dispute

with the Madoff Trustee and obtain assurance that their claims will not be subject to

disallowance or subordination, they will not have potential claims of value to sell to an outside

investor. The only means the Kingate Funds have to generate the proceeds to fund a settlement

with the Madoff Trustee is to reach an agreement with a third party to purchase their claims,

subject to a settlement with the Madoff Trustee and satisfaction of numerous other conditions.

These two transactions therefore – the Kingate Funds' settlement with the Madoff Trustee and

the Kingate Funds' potential sale of their claims – are deeply intertwined and mutually

dependent on each other.

## The Kingate Funds' Claims Relating To BLMIS

26.     Each of the Kingate Funds has two claims relating to BLMIS. One of the

claims has been referred to as a "Customer Claim" and the second as a "Remission Claim."

27.     The Customer Claim relates to claims held by each of the Kingate Funds

in the BLMIS Case that would be entitled to share in the assets recovered by the Madoff Trustee

on behalf of the BLMIS estate. The Customer Claim is based on the extent of the Kingate

Funds' "net equity" in BLMIS. In other words, to the extent the Funds' investments exceeded

their redemptions, they would have a claim in that excess amount. Here, assuming the Kingate

Funds reach a settlement with the Madoff Trustee pursuant to which they return the nearly $1

billion they redeemed prior to the BLMIS bankruptcy, the Funds' "net equity" claim would

increase to $1,624,748,095 and, unless the Bankruptcy Court ordered otherwise, the Kingate

Funds presumably would have the right to receive a pro rata recovery based on that claim amount from whatever assets the Madoff Trustee is able to recover for the estate. Any such settlement on those terms would imply that the Kingate Funds believe that they have zero percent chance of success on the merits in the litigation brought against the Funds by the Madoff Trustee.

28.     The Remission Claim seeks recovery from a separate bucket of assets. Specifically, the Remission Claim relates to the claim held by each of the Kingate Funds in what has been described as the "Forfeiture Fund" established by the United States Department of Justice ("DOJ"). The Forfeiture Fund consists, in large part, of forfeited moneys recovered by the DOJ as a result of the Madoff Trustee's settlement of an avoidance action against the estate of Jeffry Picower and certain affiliated entities. As a result of this settlement, the Picower estate agreed to forfeit to the DOJ the amount of $7,206,157,717, of which $5 billion was allocated to the BLMIS estate and the remaining amount – $2,206,157,717 – was retained by the DOJ for distribution to "victims of the BLMIS fraud through the process of remission, consistent with applicable [DOJ] regulations."

29.     Just as Mr. Picard has been appointed to serve as the Madoff Trustee, he has been selected by the DOJ to serve as the Special Master overseeing the process of remitting the more than $2 billion in Forfeiture Funds to BLMIS investors. The DOJ press release announcing the appointment of Mr. Picard as Special Master states that he will "assist in identifying eligible victims, verifying their losses, and distributing the forfeited funds in accordance with [DOJ] regulations." Thus, Mr. Picard wears two hats with respect to this matter: He acts as both the Madoff Trustee in the BLMIS SIPA liquidation and the Special

Master of the Forfeiture Fund. Actions taken by Mr. Picard in his capacity as Madoff Trustee do not necessarily bind him in his role as Special Master, and vice versa.

30.     Under the operative DOJ regulations, the Special Master has the discretion to determine which individual or entity will be granted a remission payment and the amount of any such payment to be received. The DOJ regulations do not appear to provide for any process or basis by which the Special Master must distribute any forfeited funds, and the Special Master's determinations do not appear to be subject to judicial review. Further, the DOJ regulations suggest that only certain types of claimants – victims, lienholders, and owners – may assert Remission Claims.

31.     The allegations of the Madoff Trustee's complaint against the Kingate Funds raise an important issue as to whether the Funds qualify as a "victim" under the DOJ remission regulations. For DBSI to proceed with the proposed billion dollar transaction, it is of crucial importance to know in advance that any Remission Claim will have the right to share ratably in the Forfeiture Fund with all the eligible parties. The Remission Claim is potentially worth hundreds of millions of dollars and it constituted a significant portion of the consideration embedded in DBSI's proposed purchase price.

**DBSI's Initial Bid For The Claims**

32.     In or about April 2011, the Kingate Funds solicited bids for the sale of their BLMIS-related claims, including the Customer Claim against the BLMIS estate and the Remission Claim against the Forfeiture Fund.

33.     Contrary to DBSI's recommendation, the Kingate Funds solicited bids without having first circulated a draft contract for the proposed transaction to each of the potential purchasers. As a result, potential purchasers were not asked to submit bids, based on uniform contract terms, that could be measured on an apples to apples basis. Instead, the

Kingate Funds invited potential purchasers to set forth their own structure and terms for any proposed transaction.

34.     On May 25, 2011, DBSI submitted a detailed bid letter for the acquisition of the Funds' claims.  DBSI advanced two different options for the purchase of the claims.  In addition, at the urging of the Kingate Funds, DBSI submitted a third proposal which involved the extension of a $920 million loan to facilitate the Funds' settlement with the Madoff Trustee. DBSI's bid letter was an extensive document, running to more than 14 single-spaced pages and attaching lengthy schedules and exhibits.  DBSI included in its bid letter a broad set of proposed terms and conditions that would need to be incorporated in any purchase and sale agreement with the Kingate Funds as well as any settlement agreement between the Kingate Funds and the Madoff Trustee.

35.     DBSI's formal bid letter specified that as a condition of any transaction, any settlement agreement with the Madoff Trustee must provide that the "Claims" – defined to include both the Customer Claim and the Remission Claim – would be "treated for all purposes as Allowed."  The bid letter defined "Allowed" to mean:

> allowed as a valid, enforceable, liquidated, non-contingent, undisputed, unavoidable, and unsubordinated claim that is not subject to any actual or potential avoidance, reduction, set-off, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise, and whether pursuant to Section 510(c) of the United States Bankruptcy Code or otherwise), counterclaim, cross-claim, defenses, disallowance (whether under section 502(b), (d), or (e) of the United States Bankruptcy Code or otherwise), impairment, objection, or any other challenges under any applicable law, whether foreign or domestic.

Accordingly, under the terms of the bid letter, DBSI left no room for any misunderstanding as to whether the Remission Claim to be conveyed by the Kingate Funds would be entitled to receive a full recovery from the Forfeiture Fund.

36.     Among many other terms and conditions, DBSI's bid letter also provided that DBSI would have a mechanism to enforce the terms of the settlement agreement.  The letter specifically included the proposed condition that, as a part of any transaction, DBSI would be an express third-party beneficiary to any settlement agreement between the Kingate Funds and the Madoff Trustee.  DBSI's bid was made expressly subject to the negotiation and execution of "definitive documentation [that] will contain terms and conditions to be mutually agreed upon between Buyer and Seller that are not set forth herein."

37.     The Kingate Funds did not select DBSI's bid.  Upon information and belief, the Kingate Funds endeavored to sell the claims to another potential purchaser.  The Kingate Funds, upon information and belief, were unable to reach agreement with the potential purchaser on definitive documentation, and the sale was never consummated.

**DBSI And The Kingate Funds Re-initiate Negotiations And DBSI Prepares An Initial Draft PSA Providing That The Remission Claim Would Receive A Full Recovery From The Forfeiture Fund**

38.     In July 2011, after the Kingate Funds had failed to agree to definitive documentation with their first proposed purchaser, the Funds turned once again to DBSI and inquired whether DBSI had any continuing interest in purchasing the claims.  Based on their receipt of DBSI's initial bid letter, the Kingate Funds knew that DBSI would not proceed with the transaction unless the deal documents fully provided, at a minimum, that the Remission Claim would be entitled to receive recoveries from the Forfeiture Fund on a pro rata and unsubordinated basis with all other claims and that DBSI would have a meaningful right to enforce the terms of not just the purchase and sale agreement, but also the settlement agreement with the Madoff Trustee.

39.     As an experienced claims trader, DBSI made clear to the Kingate Funds from the outset of their discussions that any sale of the claims should be governed by a detailed purchase and sale agreement. This would be to the benefit of both parties insofar as each party's rights and obligations would be comprehensively documented. DBSI advised the Kingate Funds that any PSA would have to include numerous representations, warranties and covenants by the seller, as well as a variety of conditions precedent to the closing of the transaction. Further, DBSI emphasized that many of these provisions would also need to be included in any settlement agreement between the Funds and the Madoff Trustee. From their receipt of DBSI's May 25, 2011 bid letter, the Kingate Funds understood and expected that DBSI would insist on this type of formal documentation.

40.     On August 18, 2011, in an effort to facilitate the transaction, DBSI sent the Kingate Funds' counsel an initial draft of the purchase and sale agreement for the claims (the "Initial Draft PSA"). The Initial Draft PSA was a detailed document, setting forth dozens of representations, warranties, covenants, and conditions precedent over 17 single-spaced pages. The draft also contained another five single-spaced pages of defined terms and expressly contemplated the attachment of five separate schedules and exhibits. In providing the Kingate Funds with a draft PSA, DBSI was endeavoring to clarify the terms and conditions that would govern any sale of the claims and to reduce the universe of terms that would need to be negotiated by the parties.

41.     At or around this time, DBSI's counsel also asked the Kingate Funds' counsel for a copy of the draft settlement agreement between the Funds and the Madoff Trustee. As noted above, the settlement agreement was the core document that would imbue the claims with the bundle of rights the Kingate Funds were proposing to sell to DBSI. Notwithstanding the

centrality of the draft settlement agreement, DBSI's repeated request for a copy of the draft agreement was not honored for weeks.

42.     As it related to the Remission Claim, the Initial Draft PSA left no doubt that the Remission Claim to be conveyed by the Kingate Funds would be entitled to a full recovery from the Forfeiture Fund on a pro rata and unsubordinated basis.  By way of example only, Section 8(i) contained a proposed representation and warranty by the Kingate Funds that the "Claims," a term defined to include the "Remission Claims," are "Allowed against the Debtor in the amounts set forth in the Settlement Agreement."  In addition, Section 8(u) contained a proposed seller representation and warranty, without any qualification whatsoever, that:

> the Claims are entitled to receive recoveries from any and all Forfeiture Funds based on the Allowed amount of the Remission Claim, inclusive of the Funding Obligations (without recoupment, offset, set-off or conditions of any kind), on a *pro rata* basis with all other claims entitled to receive recoveries from such Forfeiture Funds, based on whatever methodology is ultimately applied in the SIPA Liquidation for determining the Allowed amount of the Remission Claim, regardless of whether any payments have been theretofore made on account of the Claims from the Forfeiture Funds.[1]

43.     Consistent with DBSI's May 25th bid letter, the Initial Draft PSA also included numerous critical seller covenants, including the following proposed Section 10(f):

> if Remission Procedures are not in place before the Settlement Agreement is executed, [the Kingate Funds] shall take any and all steps required by Buyer, consistent with the terms of this Agreement, to ensure that:  [(1)]

---

[1]     Like DBSI's May 25th bid letter, the Initial Draft PSA defined "Allowed" to mean:

> allowed as a valid, enforceable, liquidated, non-contingent, undisputed, unavoidable, non-contingent and unsubordinated claim that is not subject to any actual or potential avoidance, reduction, set-off, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defenses, disallowance (whether under section 502(b), (d), or (e) of the Bankruptcy Code or otherwise), impairment, objection, or any other challenges under any applicable law, whether foreign or domestic.

the Claims are entitled to receive a recovery from the Forfeiture Funds based on the Allowed amount of the Remission Claim, . . . and (2) the Claims are entitled to receive recoveries from such Forfeiture Funds (without recoupment, offset, set-off, or conditions of any kind) on a *pro rata* basis with all other parties entitled to receive recoveries from such Forfeiture Funds, and that such recoveries shall be payable to any assignee or subsequent assignee of Seller.

44.    The Initial Draft PSA also set forth specific terms to be included in any settlement agreement between the Kingate Funds and the Madoff Trustee, which those parties were still in the process of negotiating.  The Initial Draft PSA made it a condition of the transaction that the Kingate Funds would not agree to a settlement agreement that did not include certain specific terms set forth in the Initial Draft PSA.  Among such terms was proposed Section 29(e) of Annex A, which provided that any settlement agreement would contain the following provision designed to ensure that the Remission Claim would fully share in any recovery from the Forfeiture Fund on a pro rata and unsubordinated basis:

if final procedures and required consents (including, but not limited to, the U.S. DOJ) (if any) are in place detailing the disposition of any Forfeiture Funds (collectively, the "Remission Procedures") before the Settlement Agreement is executed, the Settlement Agreement shall provide that (1) the Claims are entitled to receive a recovery from the Forfeiture Funds based on the Allowed amount of the Remission Claim . . . and (2) the Claims are entitled to receive recoveries from such Forfeiture Funds (without recoupment, offset, set-off, or conditions of any kind) on a *pro rata* basis with all other parties entitled to receive recoveries from such Forfeiture Funds. . . .

45.    DBSI's obligation to deliver the purchase price was expressly subject to numerous conditions precedent, including proposed Section 7(b) of the Initial Draft PSA.  Under that provision, it was a condition precedent to the closing that each seller representation and warranty "shall be true and correct."  Accordingly, if the Kingate Funds could not otherwise honor their representation and warranty that the Remission Claim would be "Allowed," DBSI would have no obligation to proceed with the proposed transaction.

46.     The Initial Draft PSA further provided, among many other protective contractual terms, that DBSI would be "an express third-party beneficiary" to any settlement agreement between the Madoff Trustee and the Kingate Funds and that the Kingate Funds would provide DBSI with "reasonable time to review and consent" to any such settlement agreement.

47.     Finally, the Initial Draft PSA provided DBSI with a one-way set of rights relating to the termination of the transaction.  The draft contemplated that DBSI, and only DBSI, would have the right to terminate the PSA if the transaction had not closed before midnight on December 31, 2011.  Thus, DBSI made clear to the Kingate Funds that if the parties could not consummate their transaction by December 31, 2011, DBSI would not have any continuing obligation to proceed with the transaction and would have the unilateral right to terminate the PSA.

48.     On August 23, 2011, counsel for the Kingate Funds sent a revised draft of the PSA to DBSI's counsel.  The draft circulated by the Kingate Funds' counsel proposed deleting, or making material revisions to, numerous provisions included in DBSI's Initial Draft PSA.  Several of the Funds' proposals materially affected provisions relating to, among other important terms, the Remission Claim's entitlement to fully share in any recovery from the Forfeiture Fund and DBSI's right to enforce the settlement agreement as a third party beneficiary.  DBSI did not accede to any of these proposed changes.

49.     The Kingate Funds also added language in their August 23rd draft PSA specifying that the Funds were reserving for themselves certain litigation claims against various third parties, including their auditors and lenders.  That issue had previously been the subject of substantial discussion between the parties.  On or about August 24, 2011, Duane Masucci of DBSI and William Tacon, one of the joint liquidators for the Kingate Funds, discussed the fact

that the Funds would not agree to sell such third party litigation claims.  At no time during their August 24, 2011 discussion (or during any prior or subsequent discussions) did Mr. Masucci inform Mr. Tacon that DBSI would purchase the Remission Claim without assurance of equal treatment with all other creditors and victims seeking a recovery from the Forfeiture Fund.

**The Confirmation Letter Was Expressly Subject To The
Negotiation And Execution Of A Purchase And Sale Agreement**

50.    On August 24, 2011, while counsel for the parties were exchanging drafts of the PSA, DBSI sent a signed copy of the Confirmation Letter to the Kingate Funds.  In contrast to the draft PSA being negotiated by the parties, the Confirmation Letter was a short document, encompassing not even three pages of operative text.  The Confirmation Letter did not set forth all material deal terms; rather, it included only certain agreed-upon terms, with the balance of the terms to be negotiated and set forth in definitive documentation.

51.    The Confirmation Letter, standing alone, did not purport to be a binding agreement on the part of DBSI to purchase the Kingate Funds' claims.  By its express terms, the Confirmation Letter reflected only the "confirmation", by the Kingate Funds, of "*our* firm, irrevocable and binding agreement [ ] to *sell* the Claims [ ] at the Purchase Rate [ ] to Deutsche Bank Securities Inc. . . ."  (Emphasis added.)  The Confirmation Letter prohibited the Kingate Funds from soliciting other potential purchasers during the period DBSI and the Funds were engaged in negotiating the terms of the sale.

52.    The obligation of the Kingate Funds to sell the claims at the designated purchase price, however, did not give rise to a parallel contractual commitment by DBSI to purchase the claims at that price.  The Confirmation Letter did not make any reference to a corresponding "firm," "irrevocable" or "binding" agreement on the part of DBSI to "purchase" the claims.  Instead, consistent with longstanding industry practice, the Confirmation Letter

expressly stated that the proposed transaction was "subject to execution of a Purchase and Sale Agreement (governed by New York law) in a form that is reasonably and mutually agreed between Seller and Buyer and which Seller and Buyer shall negotiate in good faith." Thus, the Confirmation Letter was subject to the execution of the very same type of definitive documentation that the Kingate Funds had failed to prepare in connection with its initial auction process, and still had not endeavored to prepare when it re-initiated contact with DBSI in late July 2011.

53.      The Confirmation Letter also specified that the purchase price would be 66.00% – based on the prevailing market price for enforceable and collectible claims – of the Kingate Global claim amount of $938,862,953 and the Kingate Euro claim amount of $685,885,142. This amounted to a proposed purchase price in excess of $1 billion. The size of the purchase price reflected the parties' understanding that the Kingate Funds, through their settlement agreement with the Madoff Trustee, would be in a position to convey to DBSI not just an allowed Customer Claim, but also a Remission Claim that would be entitled to recovery on a pro rata, unsubordinated basis from the Forfeiture Fund. Because the Remission Claim is expected to constitute at least 20% – and perhaps much more – of the more than $10 billion currently recovered BLMIS assets, the right to receive a full distribution from the Remission Claim constituted a significant portion of the consideration DBSI proposed paying for the claims. The economics of the proposed transaction would have been much different had the Kingate Funds agreed to sell only a speculative interest in the Forfeiture Fund, which could be denied by Mr. Picard, the Special Master of that fund, in whole or in part based on his unreviewable discretion. A purchase of a "claim" with those characteristics is little better than a lottery ticket.

54.     The structure of the proposed transaction also would have been different if all the Kingate Funds were purporting to sell was a Remission Claim that could be denied a recovery from the Forfeiture Fund at the discretion of the Special Master.  DBSI offered to pay 66% of the total claim amount for both the Customer Claim and Remission Claim, without distinction, on the condition and expectation that both claims would be entitled to a full distribution from their respective sources of recovery, in accordance with their pro rata share. Had the Kingate Funds merely been offering to sell whatever right, *if any*, they had in the Forfeiture Fund, which could be disallowed or discounted at the whim of the Special Master, neither DBSI nor any other experienced claims trader would have proposed to pay the same percentage rate for the Remission Claim as for the Customer Claim.  In fact, DBSI drew this very distinction when discussing its initial bid with the Kingate Funds in May 2011.

55.     The fact that the Confirmation Letter did not use the word "Allowed" in its definition of the Remission Claim does not reflect the parties' agreement that DBSI was merely agreeing to purchase whatever right, *if any*, the Kingate Funds had in the Forfeiture Funds to be determined by the Special Master in his unreviewable discretion.  The definition of "Remission Claim" in the Confirmation Letter is virtually identical to the definition of "Remission Claim" as set forth in DBSI's Initial Draft PSA and in DBSI's May 25, 2011 formal bid letter.  Both documents, which were far more detailed than the Confirmation Letter, contained numerous provisions specifying that the Remission Claim to be acquired by DBSI would be an "Allowed" claim, as that term was defined in those documents.  DBSI's Initial Draft PSA and its May 25, 2011 formal bid letter also set forth numerous proposed contractual terms designed to ensure that the Remission Claim would receive a recovery from the Forfeiture Fund on a pro rata and unsubordinated basis with all other claimants to that fund.  In their recent

discussions with DBSI's counsel, the Kingate Funds' counsel have not offered any explanation as to why it purportedly believed DBSI was bargaining to pay the prevailing market price for enforceable and collectible claims for what the Funds now assert is a claim that could be disallowed or denied at the whim of the Special Master.

**DBSI Engaged In Exhaustive Good Faith Negotiations
In An Effort To Reach Agreement On A PSA**

56.    After execution of the Confirmation Letter, DBSI continued to engage in good faith negotiations to agree to definitive documentation for the contemplated transaction. Indeed, on August 25, 2011, just one day after signing the Confirmation Letter, counsel for DBSI sent a revised PSA to the Kingate Funds' counsel.

57.    Although DBSI sought to accommodate a number of the Kingate Funds' proposed changes, DBSI reasonably insisted upon a number of provisions designed to protect its rights in connection with the proposed sale. Principal among these provisions were several designed to safeguard DBSI's ability to receive a pro rata and unsubordinated recovery from the Forfeiture Fund. DBSI also continued to insist on the right to review and consent to any settlement agreement between the Kingate Funds and the Madoff Trustee and to be a third-party beneficiary under that agreement. The Kingate Funds, however, refused to agree to these provisions in DBSI's revised draft PSA.

58.    Thereafter, DBSI continued to advance numerous additional proposals, both orally and in writing, in an effort to reach agreement on all material terms relating to the proposed transaction.

59.    During early September 2011, counsel for DBSI and counsel for the Kingate Funds participated in several telephone conversations in which the Kingate Funds' counsel agreed to seek the Madoff Trustee's consent to certain provisions in the draft settlement

agreement, each of which would also be embodied in the PSA.  Among the proposed terms

would be (i) a representation from the Madoff Trustee that, after conducting a thorough

investigation, he had concluded that the Kingate Funds were not complicit in BLMIS's fraud; (ii)

a provision that DBSI would be a third-party beneficiary of the settlement agreement; and (iii) a

stipulation by Mr. Picard, in his capacity as Special Master of the Forfeiture Fund, and the DOJ

that any acquirer of the Kingate Funds' Remission Claim would not receive a recovery from the

Forfeiture Fund on terms less favorable than any other claimant against that fund.

      60.    On September 12, 2011, counsel for DBSI sent to the Kingate Funds'

counsel another revised PSA reflecting these terms.

**The Kingate Funds And The Madoff Trustee Refuse
To Share The Draft Settlement Agreement With DBSI**

      61.    While DBSI was waiting for the Kingate Funds' response to its September

12, 2011 draft PSA, DBSI's counsel continued to press the Kingate Funds' counsel for a copy of

the draft settlement agreement between the Kingate Funds and the Madoff Trustee.  That draft

agreement, as noted above, was a critical document; absent a settlement with the Madoff Trustee,

the Kingate Funds could not deliver a Customer Claim or a Remission Claim in the amount and

the form they had proposed selling to DBSI – namely, claims that were free and clear of any

causes of action for disallowance or subordination by the Madoff Trustee.  From the outset of the

parties' negotiations, DBSI emphasized that it could not proceed with the transaction without

reviewing and consenting to the terms of the draft settlement agreement.  DBSI would otherwise

have no way to confirm that it would be receiving in the proposed transaction what the Kingate

Funds were purporting to offer to sell.

      62.    At the outset of negotiations over the PSA, the Kingate Funds advised

DBSI that they were not at liberty to turn over a copy of the draft settlement agreement without

the consent of the Madoff Trustee. At first, DBSI's counsel was informed that the Madoff Trustee would not allow DBSI to see the draft settlement agreement. Some time later, DBSI's counsel was told that the Madoff Trustee would permit DBSI to receive a draft of the settlement agreement if DBSI would provide the Madoff Trustee with a copy of the draft PSA. At that point, DBSI's counsel proposed that the parties enter into a routine confidentiality agreement to protect any material non-public information contained in both the draft PSA and the draft settlement agreement. Although DBSI based its draft confidentiality agreement on the same form agreement previously entered into between the Madoff Trustee and the Kingate Funds, DBSI's counsel spent several weeks unsuccessfully negotiating a confidentiality agreement with the Kingate Funds and the Madoff Trustee. Ultimately, on the morning of Saturday, September 17, 2011, the Kingate Funds agreed to share a copy of the draft settlement agreement with DBSI's counsel on an attorney's eyes only basis, but refused to allow DBSI's counsel to provide that draft agreement to any of the DBSI employees involved in this transaction.

### The Kingate Funds Endorse DBSI's Proposed Changes To The Draft Settlement Agreement

63.     The draft settlement agreement DBSI's counsel received on September 17, 2011 was a 20-page, single-spaced document. Counsel for the Kingate Funds informed DBSI's counsel that the Madoff Trustee had agreed to give DBSI's counsel only until Monday, September 19, to provide any comments to the document.

64.     That demand was patently unreasonable. Aside from the fact that DBSI's counsel was not at liberty to share the draft settlement agreement with its own client, DBSI's counsel was given just one business day to comment on a detailed agreement of critical importance which governed the parties' rights and obligations relating to a proposed billion dollar transaction. Counsel for DBSI noted the fundamental unreasonableness of this demand to

24

the Kingate Funds' counsel, stating that "it[']s hard for us to really dig into the settlement agreement with any depth until Deutsche Bank has been given access to it."

65.     It was immediately apparent to DBSI's counsel, upon review, that the draft settlement agreement did not address any of the issues DBSI had repeatedly raised in its prior drafts of the PSA.  Among other deficiencies, the draft settlement agreement did not include provisions ensuring that DBSI would be getting what it offered to pay for – a Remission Claim entitled to receive a recovery on a pro rata, unsubordinated basis, without any risk that Mr. Picard, as Special Master, could deny that claim in whole or in part in his unreviewable discretion.  Nor did the draft settlement agreement provide that DBSI would have any right to enforce the agreement's terms.

66.     Despite the unreasonable limitations placed on their review of the draft settlement agreement, DBSI's counsel promptly provided comprehensive comments to counsel for the Kingate Funds on Tuesday, September 20, 2011.  DBSI's comments addressed a number of issues of significance, including several with respect to the Remission Claim.  To address the need for certainty regarding the entitlement of the Remission Claim to recover from the Forfeiture Fund, DBSI's counsel proposed the inclusion of the following stipulation by Mr. Picard, in his capacity as both Madoff Trustee and Special Master:

> Stipulation.  The Trustee and Irving H. Picard as special master (the "Special Master") of the Forfeiture Funds stipulate and acknowledge that notwithstanding anything to the contrary in any applicable law, rule, regulation or guideline of the United States Department of Justice (the "US DOJ"):  (A) the Special Master has the authority under applicable law, rules, regulations and US DOJ guidelines to enter into this stipulation;  (B) the Kingate Funds are deemed "victims" for all purposes of the Forfeiture Funds and nothing in this Settlement Agreement shall prejudice or impair whatsoever the Kingate Funds' rights to receive distributions from the Forfeiture Funds; (C) in no case will the Buyer receive any treatment with respect to its ability to receive distributions from the Forfeiture Funds that is otherwise less favorable than the most favorable treatment afforded to any other holder of an allowed customer

claim seeking a recovery from such Forfeiture Funds; and (D) the Buyer shall be eligible to receive distributions from all Forfeiture Funds as if it were, for all purposes and from the first instance, the original holder of the Allowed Claims and the Remission Claims and without regard to the fact that such claims have been transferred to the Buyer by the Kingate Funds.

67.     The proposed stipulation from Mr. Picard, in his capacity as Special Master, was necessary to ensure that the Remission Claim would be entitled to a full recovery from the Forfeiture Fund.  Otherwise, Mr. Picard could agree not to contest the Remission Claim as Madoff Trustee, but would nevertheless have the right to deny the claim in his capacity as Special Master on any grounds he saw fit.  In such event, his conduct as Special Master would be unreviewable and DBSI would have no means of legal redress.

68.     DBSI's counsel also proposed making a number of other changes to the draft settlement agreement, including a provision establishing that DBSI would be a third party beneficiary with respect to the Remission Claim.  Such a provision was necessary to provide DBSI with the ability to enforce its right to a meaningful Remission Claim.  DBSI's counsel noted that their comments "set forth what Milbank believes are necessary revisions given the size, complexity and inherent uncertainties posed by this transaction."  DBSI's counsel cautioned that these comments reflect the views of only DBSI's outside counsel, "without any input from Deutsche Bank, and are subject to their review [as] well as further internal review."

69.     On September 21, 2011, counsel for the Kingate Funds provided comments on DBSI's proposed changes to the draft settlement agreement.  The September 21st draft circulated by the Kingate Funds, for the first time, included the critical language requested by DBSI's counsel.  Specifically, the Kingate Funds' draft settlement agreement provided that DBSI would be a third-party beneficiary thereunder and, further, that Mr. Picard, in his capacity as Special Master, would stipulate in pertinent part that:

nothing in this Settlement Agreement shall prejudice or impair whatsoever the Kingate Funds' rights to receive distributions from the Forfeiture Funds; (C) in no case will the Buyer receive any treatment with respect to its ability to receive distributions from the Forfeiture Funds that is otherwise less favorable than the most favorable treatment afforded to any other holder of an allowed customer claim seeking a recovery from such Forfeiture Funds; and (D) the Buyer shall be eligible to receive distributions from all Forfeiture Funds as if it were, for all purposes and from the first instance, the original holder of the Allowed Claims and the Remission Claims and without regard to the fact that such claims have been transferred to the Buyer by the Kingate Funds.

70.   After another exchange of drafts, DBSI's counsel reached what appeared to be an understanding with counsel for the Kingate Funds regarding an acceptable form of settlement agreement.  By email dated September 22, 2011, counsel for DBSI provided a modestly revised draft of the settlement agreement to the Kingate Funds' counsel.  DBSI's counsel confirmed that the Kingate Funds would advocate for Mr. Picard's agreement to this draft:

> If you feel you cannot credibly argue for these revisions then please let's have a call.  As discussed yesterday, we want you and your client to be comfortable with all of our proposed revisions as it appears that the Trustee is not receptive to hearing from us.  If you feel comfortable with our changes, then please feel free to send this onward to the Trustee's counsel.

*          *          *

> While we are making every effort to move forward with the proposed transaction in the face of what I can only describe as sheer irrationality, please note that it is becoming increasingly difficult for both Milbank and [Deutsche Bank] to believe that we will be able to move much farther down the field unless [Deutsche Bank] and all its participants are granted immediate and full access to the settlement agreement . . . .

It was understood amongst counsel for DBSI and the Kingate Funds that each of the proposed changes in the September 23rd draft settlement agreement would also be embodied in the corresponding PSA.

71.     By email dated September 23, 2011, counsel for the Kingate Funds agreed to endorse the draft settlement agreement containing DBSI's proposed changes. The Kingate Funds' counsel advised that "we've reviewed the markup from last night, and we're comfortable proposing all of those revisions to the trustee." While the Kingate Funds' counsel predicted that the Madoff Trustee would balk at the proposed changes, the Kingate Funds' counsel did not dispute the reasonableness of the terms in the September 23rd draft. In fact, counsel for the Kingate Funds advised DBSI's counsel that he would seek the same contractual protections were he seeking to enforce the Remission Claim on behalf of the Kingate Funds themselves.

72.     On September 28, 2011, counsel for the Madoff Trustee summarily rejected the proposed changes to the draft settlement agreement being endorsed by DBSI and the Kingate Funds. The changes rejected by the Madoff Trustee included, but were not limited to, DBSI's third party beneficiary rights and those relating to the Remission Claim's entitlement to receive a full recovery from the Forfeiture Fund on a pro rata, unsubordinated basis. DBSI's counsel urged the Kingate Funds' counsel to continue to press the Madoff Trustee to accept these changes, to no avail.

**The Kingate Funds Change Their Tactics**

73.     At this point, having failed to persuade the Madoff Trustee to accept the reasonable accommodations sought by DBSI to the draft settlement agreement (which were to be reflected in the PSA), the Kingate Funds changed their tactics. The Kingate Funds ignored that they had endorsed the very changes to the draft settlement agreement DBSI had proposed. Instead, the Kingate Funds now insisted that DBSI accept a draft PSA predicated on a version of the draft settlement agreement that did not include the critical provisions designed to ensure that

the Remission Claim would be entitled to a recovery from the Forfeiture Fund on a pro rata,

unsubordinated basis – contract terms DBSI had repeatedly demanded in its Initial Draft PSA

and at all other times.  Nor did the latest versions of the draft PSA or draft settlement agreement

circulated by the Funds provide DBSI with any legal recourse in the event the Remission Claim

was rejected at the unreviewable discretion of the Special Master.  Accordingly, even though the

Kingate Funds' counsel had felt comfortable endorsing the September 23rd draft settlement

agreement they were now asserting that a very different form of settlement agreement,

incorporating none of the critical protections DBSI had long demanded, reflected the "business

deal" between the parties.

      74.     In early October 2011, counsel for DBSI responded to the Kingate Funds'

untenable position.  DBSI's counsel pointed out that DBSI's employees were still not being

allowed access to the draft settlement agreement, noting that "[r]are is the circumstance where

the economic owners of claims are justifiably not entitled to review vitally important

documentation."  With respect to the Remission Claim, counsel for DBSI stated that the Kingate

Funds "must know from the numerous discussions we have had with respect to the separate

purchase and sale agreement and the flexibility we have shown with respect to that agreement

that we have been and are reasonable when it comes to negotiating documents."  DBSI's counsel

disputed that it was ever the "business deal" between the parties that DBSI would agree to

purchase anything less than a Remission Claim entitled to a recovery on a pro rata and

unsubordinated basis.  Anything short of that, DBSI's counsel stated, was inconsistent with the

parties' discussions and DBSI's position from the outset of their negotiations.

      75.     From that point on, despite its continued good faith efforts to negotiate the

PSA, DBSI heard nothing further from the Kingate Funds for approximately one month.  In

November 2011, as part of an obvious litigation strategy, the Kingate Funds sent DBSI a draft PSA and a corresponding draft settlement agreement on a "take it or leave it" basis. The Kingate Funds' November 2011 draft PSA did not contain the critical protections embodied in the draft September 23rd settlement agreement the Funds had previously endorsed. Among other omissions, the Kingate Funds' new drafts did not provide that the Remission Claim would be entitled to a recovery from the Forfeiture Fund or that DBSI would have a legal mechanism to enforce its rights to such a claim, as a third party beneficiary to the settlement agreement or otherwise. Nor did the Kingate Funds' purported final drafts provide that DBSI would be sold the claims on a "free and clear" basis; that Mr. Picard, in his capacity as Special Master, would acknowledge that the Kingate Funds were not complicit in the Madoff fraud; or that DBSI would have the right to review and consent to the settlement agreement. Nevertheless, the Kingate Funds' counsel wrongly asserted that these drafts reflected the parties' "agreement" as set forth in the Confirmation Letter. DBSI promptly refuted all such assertions.

76.    As part of its litigation strategy, the Kingate Funds have recently asserted that DBSI's negotiating position is a pretext, claiming that DBSI has advanced new deal terms to take advantage of a recent drop in the market price for claims in the Madoff estate. In fact, DBSI has not altered its position regarding the type of fundamental contractual protections it needs in the definitive deal documents, dating back to its initial bid letter in May 2011, and continuing through each of the draft PSAs and settlement agreements it has exchanged with the Kingate Funds. Upon information and belief, any material decline in the price of BLMIS claims occurred in the aftermath of the September 27, 2011 Opinion and Order issued by the Honorable Jed S. Rakoff in *Irving Picard v. Saul B. Katz*, 11 Civ. 3605 (S.D.N.Y. 2011) (JSR). That decision was rendered not only after DBSI had prepared and circulated its Initial Draft PSA, but also after

DBSI and the Kingate Funds had agreed on the form of the September 23rd draft settlement agreement.

77.     Throughout November and December 2011, DBSI's counsel has participated in numerous conversations with the Kingate Funds' counsel regarding the proposed transaction.  DBSI's counsel has advised the Kingate Funds' counsel that DBSI would be prepared to meet with the Madoff Trustee if the parties could make significant progress in reaching agreement on a definitive PSA, including with respect to the Remission Claim issues. As late as December 2011, DBSI advised the Kingate Funds' counsel that it stood ready to consummate the proposed transaction at the designated purchase price of more than $1 billion based upon acceptable PSA and settlement agreement documentation.  Despite DBSI's position, the Kingate Funds filed this action.

## COUNT ONE
### (For Declaratory Relief)

78.     Defendant-counterclaim plaintiff DBSI repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

79.     Under 28 U.S.C. § 2201(a), there exists an actual controversy between DBSI and the Kingate Funds, within the jurisdiction of this Court, such that the Court may declare the rights and legal relations of the parties under the Confirmation Letter.

80.     The Confirmation Letter, standing alone, is not a firm, binding, irrevocable agreement by DBSI to purchase the Claims.  By its express terms, the Confirmation Letter provides that the proposed transaction is "subject to execution of a Purchase and Sale Agreement" that is to be "reasonably and mutually agreed between Seller and Buyer and which Seller and Buyer shall negotiate in good faith."

81.     Before the parties' execution of the Confirmation Letter, DBSI advised the Kingate Funds that the PSA would need to reflect, among other things, (i) that DBSI had the right to review and consent to any settlement agreement between the Kingate Funds and the Madoff Trustee, (ii) that any such settlement agreement provided assurance that the Remission Claim would be entitled to a recovery from the Forfeiture Fund on a pro rata and unsubordinated basis, and (iii) that any such agreement provided DBSI with a meaningful right to enforce the agreement in the event the Special Master denied the Remission Claim.

82.     The Kingate Funds were aware that DBSI would not proceed with the proposed transaction unless the PSA and the corresponding settlement agreement between the Funds and the Madoff Trustee provided, among other things, that the Remission Claim was entitled to fully share in the Forfeiture Fund on a pro rata, unsubordinated basis and that DBSI had the right to enforce that provision as a third-party beneficiary or otherwise.

83.     At all relevant times, DBSI engaged in extensive, good faith negotiations with the Kingate Funds in an effort to reach agreement on all material terms.

84.     Notwithstanding DBSI's extensive, good faith efforts, the Kingate Funds have asserted that DBSI is obliged to consummate the proposed transaction under the terms of the Confirmation Letter, that all other documents (including the PSA and the settlement agreement) are "ancillary," and that DBSI has not engaged in good faith negotiations over the PSA.

85.     Accordingly, a real and immediate controversy exists between DBSI and the Kingate Funds concerning the parties' rights and obligations under the Confirmation Letter. In these circumstances, DBSI is entitled to a declaration of its rights and obligations under the Confirmation Letter.  Specifically, DBSI is entitled to a declaration that:

(i)      the Confirmation Letter, standing alone, does not bind DBSI to purchase the claims;

(ii)      to the extent the Confirmation Letter obligated DBSI to negotiate in good faith with the Kingate Funds, DBSI has fully complied with any such obligation; and

(iii)      under the Confirmation Letter, DBSI has no ongoing obligation to continue negotiating the PSA with the Kingate Funds.

## PRAYER FOR RELIEF

WHEREFORE, Deutsche Bank Securities Inc. respectfully requests that the Court grant the following relief:

(1)      a declaration (i) that the Confirmation Letter, standing alone, does not bind DBSI to purchase the claims; (ii) that to the extent the Confirmation Letter obligated DBSI to negotiate in good faith with the Kingate Funds, DBSI has fully complied with any such obligation; and (iii) that DBSI has no ongoing obligation under the Confirmation Letter to continue to negotiate the PSA with the Kingate Funds; and

(2)      such other relief as the Court deems just and proper, together with the costs and disbursements of this action.

## ANSWER

DBSI, by and through its undersigned counsel, hereby answers the Complaint of the Kingate Funds as set forth below.  For the avoidance of doubt, DBSI denies each and every allegation in the Complaint not specifically admitted herein.

1.      Admits so much of the allegations contained in paragraph 1 of the Complaint as allege that the Kingate Funds seek certain declaratory relief, and denies the remaining allegations contained in paragraph 1.

2.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 of the Complaint.

3.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 3 of the Complaint, except admits that the Kingate Funds purport to be claimants against the Madoff estate.

4.      Admits so much of the allegations contained in paragraph 4 of the Complaint as allege that the Kingate Funds and DBSI signed a letter dated August 24, 2011 (the "Confirmation Letter"), respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof, denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of paragraph 4, and denies the remaining allegations of paragraph 4.

5.      Denies the allegations contained in paragraph 5 of the Complaint.

6.      Denies the allegations contained in paragraph 6 of the Complaint.

7.      Denies the allegations contained in paragraph 7 of the Complaint.

8.      Admits so much of the allegations contained in paragraph 8 of the Complaint as allege that the Kingate Funds purport to seek declaratory relief from this Court, and denies the remaining allegations of paragraph 8.

9.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9 of the Complaint.

10.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 of the Complaint.

11.     Admits the allegations contained in paragraph 11 of the Complaint except avers that DBSI is an indirect subsidiary of Deutsche Bank AG.

12.     Neither admits nor denies the allegations contained in paragraph 12 of the Complaint to the extent they consist of legal conclusions to which no response is required, except admits that the Kingate Funds purport to base jurisdiction on the statute identified in paragraph 12 and admits that DBSI is a Delaware corporation.

13.     Neither admits nor denies the allegations contained in paragraph 13 of the Complaint to the extent they consist of legal conclusions to which no response is required, except admits that the Kingate Funds purport to base venue on the statute indentified in paragraph 13.

14.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of the Complaint.

15.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the Complaint.

16.     Admits so much of the allegations contained in paragraph 16 of the Complaint as allege that BLMIS has been placed in a SIPA liquidation proceeding, and denies knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 16.

17.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 17 of the Complaint.

18.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18 of the Complaint.

19.     Admits so much of the allegations contained in paragraph 19 of the Complaint as allege that the SIPA Trustee has asserted claims against the Kingate Funds, and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 19.

20.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 of the Complaint.

21.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 of the Complaint.

22.     Admits so much of the allegations contained in paragraph 22 of the Complaint as allege that in or about July 2011, the Kingate Funds and DBSI discussed a potential transaction regarding the sale of certain claims and that the Kingate Funds represented that they would not engage in discussions with other potential purchasers for various periods after July 29, 2011, and denies the remaining allegations contained in paragraph 22.

23.     Admits so much of the allegations contained in paragraph 23 of the Complaint as allege that DBSI sent a draft PSA to the Kingate Funds in August 2011, prior to the execution of the Confirmation Letter, and denies the remaining allegations contained in paragraph 23.

24.    Admits that the parties executed a Confirmation Letter on August 24, 2011, respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof, and denies the remaining allegations contained in paragraph 24.

25.    Admits that Duane Masucci of DBSI received an email from William Tacon on or about August 24, 2011, respectfully refers the Court to the August 24, 2011 email for the complete and accurate terms thereof, admits that Mr. Masucci sent an executed Confirmation Letter to Mr. Tacon on or about August 24, 2011, and denies the remaining allegations contained in paragraph 25.

26.    Denies the allegations contained in paragraph 26 of the Complaint, and respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof.

27.    Denies the allegations contained in paragraph 27 of the Complaint and respectfully refers this Court to the Confirmation Letter for the complete and accurate terms thereof.

28.    Denies the allegations contained in paragraph 28 of the Complaint and respectfully refers this Court to the Confirmation Letter for the complete and accurate terms thereof.

29.    Denies knowledge or information sufficient to form a belief with respect to the first sentence of paragraph 29 of the Complaint, denies the remaining allegations contained in paragraph 29, and respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof.

30.     Denies the allegations contained in paragraph 30 of the Complaint and respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof.

31.     Admits the first sentence of paragraph 31 of the Complaint, and denies the remaining allegations of paragraph 31.

32.     Admits the first sentence of paragraph 32 of the Complaint, and denies the remaining allegations of paragraph 32.

33.     Denies the last sentence of paragraph 33 of the Complaint, and denies knowledge or information sufficient to form a belief with respect to the remaining allegations contained in paragraph 33.

34.     Admits that DBSI commented on provisions relating to the Forfeiture Fund in various drafts of the PSA, respectfully refers the Court to the September 2, 2011 email sent by the Kingate Funds' counsel for the complete and accurate terms thereof, and denies the remaining allegations contained in paragraph 34 of the Complaint.

35.     Denies the allegations contained in paragraph 35 of the Complaint.

36.     Admits so much of the allegations contained in paragraph 36 of the Complaint as allege that the Kingate Funds' counsel provided DBSI's counsel with a draft of the settlement agreement on or about September 17, 2011 and that the Kingate Funds endorsed changes made by DBSI to the draft settlement agreement, and denies the remaining allegations of paragraph 36.

37.     Denies the allegations contained in paragraph 37 of the Complaint.

38.     Denies the allegations contained in paragraph 38 of the Complaint.

39.     Admits so much of the allegations contained in paragraph 39 of the Complaint as allege that the Kingate Funds' counsel purported to send DBSI versions of the PSA and the

settlement agreement on or about November 7, 2011, and denies the remaining allegations contained in paragraph 39 of the Complaint.

40.      Admits so much of the allegations contained in paragraph 40 of the Complaint as allege that DBSI has not reached agreement with the Kingate Funds as to the terms of a PSA, and denies the remaining allegations contained in paragraph 40.

41.      Admits so much of the allegations contained in paragraph 41 of the Complaint as allege that on or about November 16, 2011 DBSI's counsel sent a letter to the Kingate Funds' counsel, respectfully refers the Court to the November 16, 2011 letter for the complete and accurate terms thereof, and denies the remaining allegations contained in paragraph 41.

42.      Admits so much of the allegations contained in paragraph 42 of the Complaint as allege that on or about November 17, 2011, the Kingate Funds' counsel sent a letter to DBSI's counsel, respectfully refers the Court to the November 17, 2011 letter for the complete and accurate terms thereof, and denies the remaining allegations contained in paragraph 42.

43.      Admits so much of the allegations contained in paragraph 43 of the Complaint as allege that on or about November 25, 2011, DBSI's counsel sent a letter to the Kingate Funds' counsel, respectfully refers the Court to the November 25, 2011 letter for the complete and accurate terms thereof, and denies the remaining allegations contained in paragraph 43.

44.      Denies the allegations contained in paragraph 44 of the Complaint.

45.      Admits so much of the allegations contained in paragraph 45 of the Complaint as allege that on or about December 1, 2011, the Kingate Funds' counsel sent an email to DBSI's Funds' counsel, respectfully refers the Court to the December 1, 2011 email for the complete and accurate terms thereof, and denies the remaining allegations of paragraph 45.

46.      Denies the allegations contained in paragraph 46 of the Complaint.

47.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 47 of the Complaint.

## ANSWER TO FIRST CAUSE OF ACTION
### (Declaratory Judgment)

48.     Repeats and realleges the foregoing responses to each and every allegation above and otherwise incorporates the responses contained above.

49.     Respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof.

50.     Denies the allegations contained in paragraph 50 of the Complaint.

51.     Admits so much of the allegations contained in paragraph 51 of the Complaint as allege that the Confirmation Letter states that the Global Claim Amount is $938,862,953 and the Euro Claim Amount is $685,885,142, respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof, and denies the remaining allegations contained in paragraph 51.

52.     Admits so much of the allegations contained in paragraph 52 of the Complaint as allege that the Confirmation Letter states that the Purchase Price is 66%, respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof, and denies the remaining allegations contained in paragraph 52.

53.     Respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof, and denies knowledge or information sufficient to form a belief as to the remaining allegations contained in paragraph 53.

54.     Respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof.

55.     Admits so much of the allegations contained in paragraph 55 of the Complaint as allege that the Confirmation Letter states that "[t]he Transaction is subject to execution of a Purchase and Sale Agreement (governed by New York law) in a form that is reasonably and mutually agreed between Seller and Buyer and which Seller and Buyer shall negotiate in good faith," respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof, and denies the allegations contained in paragraph 55.

56.     Admits the allegations contained in paragraph 56 of the Complaint.

57.     Admits so much of the allegations contained in paragraph 57 of the Complaint as allege that the Kingate Funds purport to seek declaratory relief, and denies the remaining allegations of paragraph 57.

## ANSWER TO SECOND CAUSE OF ACTION
### (Declaratory Judgment)

58.     Repeats and realleges each and every allegation contained above and otherwise incorporates the allegations contained above.

59.     Respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof, and denies the allegations contained in paragraph 59 of the Complaint.

60.     Denies the allegations contained in paragraph 60 of the Complaint.

61.     Respectfully refers the Court to the Confirmation Letter for the complete and accurate terms thereof, and denies the allegations contained in paragraph 61 of the Complaint.

62.     Denies the allegations contained in paragraph 62 of the Complaint.

63.     Denies the allegations contained in paragraph 63 of the Complaint.

64.     Denies the allegations contained in paragraph 64 of the Complaint.

65.     Denies the allegations contained in paragraph 65 of the Complaint.

66.     Denies the allegations contained in paragraph 66 of the Complaint.

67.     Denies the allegations contained in paragraph 67 of the Complaint.

68.     Admits so much of the allegations of paragraph 68 of the Complaint as allege that the Kingate Funds purport to seek declaratory relief, and denies the remaining allegations contained in paragraph 68.

69.     Denies the allegations contained in the "Prayer For Relief" section which begins on page 21 of the Complaint and avers that Plaintiffs are not entitled to any relief whatsoever.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The Confirmation Letter, standing alone, is not a binding agreement obligating DBSI to purchase the claims referenced therein.

## THIRD AFFIRMATIVE DEFENSE

The Complaint is barred, in whole or in part, because DBSI has met all of its obligations, if any, that existed under the Confirmation Letter.

## FOURTH AFFIRMATIVE DEFENSE

To the extent the Kingate Funds allege that DBSI failed to perform any obligations under the Confirmation Letter, such performance was excused.

## FIFTH AFFIRMATIVE DEFENSE

DBSI acted at all time and in all respects in good faith.

## SIXTH AFFIRMATIVE DEFENSE

The Kingate Funds' claims are barred by the equitable doctrines of waiver and estoppel.

## SEVENTH AFFIRMATIVE DEFENSE

The Kingate Funds lack standing to seek the relief demanded in the Complaint.

## EIGHTH AFFIRMATIVE DEFENSE

The Kingate Funds' claims are barred because there was no meeting of the minds as to the nature of the claims to be conveyed by the Funds.

## NINTH AFFIRMATIVE DEFENSE

DBSI hereby gives notice that it intends to rely upon such other and further defenses as may become available or apparent during pre-trial proceedings in this case and hereby reserves all rights to assert such defenses.

DATED:  January 11, 2012

Respectfully submitted,

MILBANK, TWEED, HADLEY &
McCLOY LLP

By: _____
        Thomas A. Arena (TA-4613)
        Mia C. Korot (MK-5878)
One Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

*Attorneys for Defendant Deutsche Bank*
*Securities Inc.*